## KAISER STEEL CORP. *v.* MULLINS ET AL.

No. 80–1345.   Argued November 10, 1981—Decided January 13, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 89.

*A. Douglas Melamed* argued the cause for petitioner. With him on the briefs was *Lynn Bregman.*

*Stephen J. Pollak* argued the cause for respondents. With him on the brief were *Ralph J. Moore, Jr., Wendy S. White,* and *E. Calvin Golumbic.*

*Barbara E. Etkind* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Lee, Assistant Attorney General*

*Baxter, Deputy Solicitor General Wallace, Robert B. Nicholson, Robert J. Wiggers*, and *T. Timothy Ryan, Jr.**

JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether a coal producer, when it is sued on its promise to contribute to union welfare funds based on its purchases of coal from producers not under contract with the union, is entitled to plead and have adjudicated a defense that the promise is illegal under the antitrust and labor laws.

I

The National Bituminous Coal Wage Agreement of 1974 is a collective-bargaining agreement between the United Mine Workers of America (UMW) and hundreds of coal producers, including steel companies such as petitioner Kaiser Steel Corp. The agreement required signatory employers to contribute to specified employee health and retirement funds. Section (d)(1) of Article XX required employers to pay specified amounts for each ton of coal produced and for each hour worked by covered employees. In addition, the section included a purchased-coal clause requiring employers to contribute to the trust specified amounts on "each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by [the employer]

*Briefs of *amici curiae* urging reversal were filed by *James D. Hutchinson* and *John M. Cannon* for the Mid-America Legal Foundation; and by *Steven L. Friedman* and *John L. Kilcullen* for the Pennsylvania Coal Mining Association.

Briefs of *amici curiae* urging affirmance were filed by *Alan M. Levy* for the Central States, Southeast and Southwest Areas Pension Fund; by *James P. Watson, George M. Cox, John S. Miller, Jr.*, and *Lionel Richman* for the Construction Laborers Trust Funds for Southern California et al.; by *Gerald M. Feder* and *Denis F. Gordon* for the National Coordinating Committee for Multiemployer Plans; by *Wayne Jett* and *Julius Reich* for the Operating Engineers Pension Trust et al.; and by *Harrison Combs* and *Willard P. Owens* for the United Mine Workers of America.

for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made. . . ."[1] Section (d) also provided that employers would furnish the trustees with monthly statements showing the full amounts due the trust funds as well as the tons of coal produced, procured, or acquired for use or for sale. The parties agreed that if the clause requiring contributions based on purchased coal was held illegal by any court or agency, the union could demand negotiations with respect to a replacement for the invalidated provision.[2]

Kaiser operates a steel mill in California and coal mines in Utah and New Mexico. Its mines produce only high-volatile coal, so it must purchase mid-volatile coal used in steel manufacturing from another producer. Since 1959, Kaiser has purchased virtually all of its mid-volatile coal requirements from Mid-Continent Coal and Coke Co. Mid-Continent's employees are represented by the Redstone Workers' Association, and their wages and benefits during the period covered by the 1974 Agreement were equal or superior to those required by the UMW contract. Nevertheless, the UMW has repeatedly attempted to become the collective-bargaining representative for Mid-Continent's employees. According to affidavits submitted by Kaiser, the purchased-coal clause was not taken into account in calculating the needs and

---

[1] Kaiser has been a UMW signatory since the 1940's. The purchased-coal clause was first included in the 1964 Agreement, although the UMW agreements left steel companies such as Kaiser free to purchase non-UMW coal for use in steel production until 1971 without penalty.

[2] The 1971 purchased-coal clause and its predecessors have been subject to litigation on the grounds that the clause is an illegal "hot cargo" agreement under § 8(e) of the National Labor Relations Act (NLRA), 29 U. S. C. § 158(e), see, e. g., *Riverton Coal Co.* v. *UMW*, 453 F. 2d 1035 (CA6), cert. denied, 407 U. S. 915 (1972), and that it constitutes a group boycott in violation of the antitrust laws. See, e. g., *Mine Workers* v. *Pennington*, 381 U. S. 657 (1965); *South-East Coal Co.* v. *Consolidation Coal Co.*, 434 F. 2d 767 (CA6 1970), cert. denied, 402 U. S. 983 (1971).

revenues of the various UMW trust funds during the negotiation of the 1974 Agreement.[3]

Kaiser complied with its obligation under the 1974 contract to make contributions based on the coal it produced and the hours worked by its miners. It did not, however, report the coal that it acquired from others or make contributions based on such purchased coal. After the expiration of the 1974 contract, the trustees of the UMW Health and Retirement Funds, respondents here, sued Kaiser seeking to enforce the latter's obligation to report and contribute with respect to coal not produced by Kaiser but acquired from others. Jurisdiction was asserted under § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U. S. C. § 185, and § 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 891, 29 U. S. C. § 1132. Kaiser admitted its failure to report and contribute but defended on the ground, among others, that the agreement in these respects was void and unenforceable as violative of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U. S. C. §§ 1 and 2, and § 8(e) of the NLRA, 73 Stat. 543, 29 U. S. C. § 158(e). The District Court did not pass on the legality of the purchased-coal agreement under either the Sherman Act or the NLRA. It nevertheless rejected Kaiser's defense of illegality and granted the trustees' motion for summary judgment. 466 F. Supp. 911 (1979). The Court of Appeals affirmed, 206 U. S. App. D. C. 334, 642 F. 2d 1302 (1980), also rejecting Kaiser's defense without adjudicating the legality of the purchased-coal clause.

We granted Kaiser's petition for certiorari raising the question, among others, whether the Court of Appeals had

---

[3] If Kaiser had purchased its mid-volatile coal requirements from a UMW producer, it would not be required to make any payments under the purchased-coal clause. The producer of mid-volatile coal would increase its contributions to the trust funds based on the amount of coal mined and the number of hours worked by employees, but in turn the trust funds' obligations to UMW members would increase.

properly foreclosed its defense based on the illegality of its promise to report and contribute in connection with coal purchased from other producers.   451 U. S. 969 (1981).   We now reverse.

## II

There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law.   In *McMullen* v. *Hoffman*, 174 U. S. 639 (1899), two bidders for public work submitted separate bids without revealing that they had agreed to share the work equally if one of them were awarded the contract.   One of the parties secured the work and the other sued to enforce the agreement to share.   The Court found the undertaking illegal and refused to enforce it, saying:

> "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract.   In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it . . . ."   *Id.*, at 654.

> "[T]o permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand.   The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest."   *Id.*, at 669.

The rule was confirmed in *Continental Wall Paper Co.* v. *Louis Voight & Sons Co.*, 212 U. S. 227 (1909), where the Court refused to enforce a buyer's promise to pay for purchased goods on the ground that the promise to pay was itself part of a bargain that was illegal under the antitrust laws. "In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it

should be denied without regard to the interests of individual parties." *Id.*, at 262.[4]

Kaiser's position is that to require it to make contributions based on purchased coal would be to enforce a bargain that violates two different federal statutes, the Sherman Act and the NLRA. Sections 1 and 2 of the Sherman Act prohibit contracts, combinations, and conspiracies in restraint of trade, as well as monopolization and attempts to monopolize. Kaiser urges that the purchased-coal clause is illegal under these sections because it puts non-UMW producers at a disadvantage in competing for sales to concerns like Kaiser and because it penalizes Kaiser for shopping among sellers for the lowest available price.[5]

Section 8(e) of the NLRA forbids contracts between a union and an employer whereby the employer agrees to cease doing business with or to cease handling the products of another employer. Kaiser submits that being forced to contribute based on its purchases of coal from other employers violates § 8(e), the hot-cargo provision, because it penalizes Kaiser for dealing with other employers who do not have a contract with the union and because the major purpose of prohibiting hot-cargo agreements is to protect employers like Kaiser from being coerced into aiding the union in its organizational or other objectives with respect to other employers.

The Court of Appeals, like the District Court, declined to pass on the legality of the purchased-coal clause under either the Sherman Act or the NLRA. It was apparently of the

---

[4] See also *Hurd* v. *Hodge*, 334 U. S. 24, 34–35 (1948); *D. R. Wilder Manufacturing Co.* v. *Corn Products Refining Co.*, 236 U. S. 165, 177 (1915); *Bement* v. *National Harrow Co.*, 186 U. S. 70, 88 (1902); *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 548–549 (1902).

[5] In order to sell coal to Kaiser, a non-UMW producer must lower its price such that when added to the amount Kaiser must pay under the purchased-coal clause, the price is still competitive with those charged by UMW producers.

view that even if the agreement was unlawful, the illegality defenses should not be sustained in this case. We disagree. None of the grounds offered by the Court of Appeals or by the respondents for rejecting Kaiser's defenses are persuasive.

We do not agree, in the first place, that if Kaiser's agreement to contribute based on purchased coal is assumed to be illegal under either the Sherman Act or the NLRA, its promise to contribute could be enforced without commanding unlawful conduct. The argument is that employers' contributions to union welfare funds are not, in themselves and standing alone, illegal acts and that ordering Kaiser to pay would therefore not demand conduct that is inherently contrary to public policy. Kaiser, however, did not make a naked promise to pay money to the union funds. The purchased-coal provision obligated it to pay only if it purchased coal from other employers and then only if contributions to the UMW funds had not been made with respect to that coal. Kaiser's obligation arose from and was measured by its purchases from other producers. If Kaiser's undertaking is illegal under the antitrust or the labor laws, it is because of the financial burden which the agreement attached to purchases of coal from non-UMW producers, even though they may have contributed to other employee welfare funds. It is plain enough that to order Kaiser to pay would command conduct that assertedly renders the promise an illegal undertaking under the federal statutes.

We do not agree that *Kelly* v. *Kosuga*, 358 U. S. 516 (1959), compels or even supports a contrary result. In that case, both petitioner and respondent were engaged in marketing onions. Petitioner agreed to buy a substantial portion of the onions owned by respondent. Petitioner and respondent mutually agreed that neither would deliver any onions to the futures market for the balance of the trading season. The agreement was for the purpose of fixing the price and limiting the amount of onions sold in the State of

Illinois, thereby "creating a false and a fictitious market" for that produce. *Id.*, at 517. After petitioner defaulted on the payments due under the contract, respondent sued for the balance of the purchase price and was awarded summary judgment. Both the District Court and the Court of Appeals rejected petitioner's claim that his undertaking was unenforceable because part of the agreement violated the Sherman Act. This Court affirmed. The Court said that "[a]s a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor," *id.*, at 518, particularly where the plea is made by a purchaser in an action to recover from him the agreed price for goods sold. Various cases in this Court were cited to support the observation, and *Continental Wall Paper Co.* v. *Louis Voight & Sons Co.*, 212 U. S. 227 (1909), where the defense was sustained, was distinguished as a case where a judgment for an excessive purchase price "would be to make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." *Kelly* v. *Kosuga, supra*, at 520. The Court went on to say that "[p]ast the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy . . . 'of preventing people from getting other people's property for nothing when they purport to be buying it.'" 358 U. S., at 520–521 (quoting *Continental Wall Paper Co.* v. *Louis Voight & Sons Co., supra*, at 271). Applying this approach to the facts before it, the Court observed:

> "[W]hile the nondelivery agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed, it can hardly be said to enforce a violation of the Act to give legal effect to a completed sale of onions at a fair price. . . . [W]here, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent

of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question." 358 U. S., at 521.

Respondents construe *Kosuga* as standing for two general propositions: first, that when a contract is wholly performed on one side, the defense of illegality to enforcing performance on the other side will not be entertained;[6] and second, that the express remedies provided by the Sherman Act are not to be added to by including the avoidance of contracts as a sanction.[7]  It is apparent from the opinion in that case, however, that both propositions were subject to the limitation that the illegality defense should be entertained in those circum-

---

[6] The contention is that since the contract has expired, enforcing the promise to contribute will not bring about any of the evils that the antitrust or labor laws are designed to prevent.   But if a promise is illegal at its inception and cannot be enforced during the term of the contract, it does not spring to life and become enforceable when the contract expires.   If penalizing Kaiser for purchasing coal from producers without contracts with the UMW is illegal, it is not less so if the penalty is extracted after the termination of the promise.   The suit is still a suit on a presumptively illegal undertaking.   If a promisee need only wait until a contract expires to enforce an illegal provision, the defense of illegality would obviously be ephemeral.   Cases such as *Continental Wall Paper Co.* v. *Louis Voight & Sons Co.*, 212 U. S. 227 (1909), and *McMullen* v. *Hoffman*, 174 U. S. 639 (1899), confound such a rule.   And if it be suggested that Kaiser should not have waited so long to assert its defense, the Court has held that "rules of estoppel will not be permitted to thwart the purposes of statutes of the United States." *Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173, 176 (1942).

[7] Refusing to enforce a promise that is illegal under the antitrust or labor laws is not providing an additional remedy contrary to the will of Congress. A defendant proffering the defense seeks only to be relieved of an illegal obligation and does not ask any affirmative remedy based on the antitrust or labor laws.   "[A]ny one sued upon a contract may set up as a defence that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defence to the action. . . . The act . . . gives to any person injured in his business or property the right to sue, but that does not prevent a private individual when sued upon a contract which is void as in violation of the act from setting it up as a defence, and we think when

stances where its rejection would be to enforce conduct that the antitrust laws forbid. In *Kosuga*, there were two promises, one to pay for purchased onions and the other to withhold onions from the market. The former was legal and could be enforced, the latter illegal and unenforceable.

*Kosuga* thus contemplated that the defense of illegality would be entertained in a case such as this. If the purchased-coal agreement is illegal, it is precisely because the promised contributions are linked to purchased coal and are a penalty for dealing with producers not under contract with the UMW. In *Kosuga*, withholding onions from the market was not in itself illegal and could have been done unilaterally. But the agreement to do so, as the Court recognized, was unenforceable. Here, employer contributions to union welfare funds may be quite legal more often than not, but an agreement linking contributions to purchased coal, if illegal, is subject to the defense of illegality.

Respondents' reliance on *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459 (1960), is no more persuasive. There, as here, a collective-bargaining contract bound the coal company to contribute to an employee trust fund. When sued by the trustees for delinquent contributions, the employers defended on the ground that the union had violated the no-strike clause contained in the contract. Although the strikes were illegal, the Court held that the company's promise to contribute to the fund was independent of and not conditioned on the union's performance of its promise not to strike. Furthermore, the company was not entitled to a setoff

---

proved it is a valid defence to any claim made under a contract thus denounced as illegal." *Bement* v. *National Harrow Co.*, 186 U. S., at 88.

As is evident from the text, *Kelly* v. *Kosuga* did not hold that the promisor may be forced to perform an illegal contract because he has another remedy that would make him whole. The case did hold that the promisor may not avoid performing a perfectly legal promise because he has also made a separate, illegal undertaking. In doing so, *Kosuga* conforms to a common-law exception to the rule that courts will not enforce illegal contracts. See 6A A. Corbin, Contracts §§ 1518–1531 (1962 ed. and Supp. 1964); Comment, 27 U. Chi. L. Rev. 758, and n. 2 (1959–1960).

against the trustees, who were innocent third parties, at least in the absence of some indication in the contract that the parties had intended to permit the employer to reduce its contributions by the amount of his damages caused by the striking unions. Just as in *Kosuga*, however, the promise that was enforced was not an illegal undertaking. Aside from the defense based on the union's default, there was no claim that the employer's promise to pay was illegal and unenforceable. The decision in no respect suggests that trustees could collect payments pursuant to a promise that itself violates the antitrust laws or the NLRA.[8]

### III

We also do not agree that the question of the legality of the purchased-coal clause under § 8(e) of the NLRA was within the exclusive jurisdiction of the National Labor Relations Board and that the District Court was therefore without authority to adjudicate Kaiser's defense in this respect. The Board is vested with primary jurisdiction to determine what is or is not an unfair labor practice. As a general rule, federal courts do not have jurisdiction over activity which "is arguably subject to § 7 or § 8 of the [NLRA]," and they "must defer to the exclusive competence of the National Labor Relations Board." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 245 (1959). See also *Garner* v. *Teamsters*, 346 U. S. 485, 490–491 (1953). It is also well established, however, that a federal court has a duty to determine whether a contract violates federal law before enforcing it. "The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the re-

---

[8] As the Court of Appeals recognized, "third-party beneficiaries, like the Trustees here, are subject to the contract defenses of nonperforming promisors." 206 U. S. App. D. C. 334, 344, 642 F. 2d 1302, 1312 (1980). In this respect, pension fund trustees have no special status which exempts them from the general rule that courts do not enforce illegal contracts. Only Congress could create such an exemption and, as discussed in Part IV, it has not done so.

strictions and limitations of the public policy of the United States as manifested in . . . federal statutes. . . . Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power." *Hurd* v. *Hodge*, 334 U. S. 24, 34–35 (1948) (footnotes omitted).

The "touchstone" and "central theme" of § 8(e) is the protection of neutral employers, such as Kaiser, which are caught in the middle of a union's dispute with a third party. *National Woodwork Manufacturers Assn.* v. *NLRB*, 386 U. S. 612, 624–626, 645 (1967). Section 8(e) provides not only that "it shall be an unfair labor practice" to enter an agreement containing a hot-cargo clause, but also that "any contract or agreement entered into heretofore or hereafter containing [a hot-cargo clause] shall be. to such extent unenforcible *[sic]* and void." This strongly implies that a court must reach the merits of an illegality defense in order to determine whether the contract clause at issue has any legal effect in the first place.

That § 8(e) renders hot-cargo clauses void at their inception and at all times unenforceable by federal courts is also evident from its legislative history. It was enacted to close a loophole created by *Carpenters* v. *NLRB*, 357 U. S. 93 (1958) *(Sand Door)*. There the Court held that the existence of a hot-cargo clause was not a defense to an unfair labor practice charge brought by a union against an employer, emphasizing that observance of the clause was not unlawful. "Section 8(e) was designed to plug this gap in the legislation by making the 'hot cargo' clause itself unlawful. The *Sand Door* decision was believed by Congress . . . to create the possibility of damage actions against employers for breaches of 'hot cargo' clauses . . . ." *National Woodwork Manufacturers Assn.* v. *NLRB*, *supra*, at 634. If a union may not maintain a damages action for violation of a hot-cargo clause, it also may not enforce a hot-cargo clause in an action for specific performance.

That a federal court may determine the merits of Kaiser's § 8(e) defense is further supported by *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975). There the petitioner filed suit claiming that an agreement between it and the respondent union violated §§ 1 and 2 of the Sherman Act. Respondent contended that the agreement was exempt from the antitrust laws because it was authorized by § 8(e). The Court of Appeals refused to decide whether § 8(e) permitted the agreement or whether the agreement constituted an unfair labor practice under § 8(e), holding that the NLRB "has exclusive jurisdiction to decide in the first instance what Congress meant in 8(e) and 8(b)(4)." *Connell Construction Co.* v. *Plumbers and Steamfitters Local Union No. 100*, 483 F. 2d 1154, 1174 (CA5 1973) (footnote omitted). This Court reversed on the ground that "the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws." 421 U. S., at 626 (footnote omitted). See also *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 684–688 (1965). The Court then addressed the § 8(e) issue on the merits and found that § 8(e) did not allow the agreement at issue. 421 U. S., at 633. As a result, the agreement was subject to the antitrust laws, for the majority was persuaded that the legislative history did not suggest "labor-law remedies for § 8(e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA." *Id.*, at 634 (footnote omitted).

In *Connell*, we decided the § 8(e) issue in the first instance. It was necessary to do so to determine whether the agreement was immune from the antitrust laws. Here a court must decide whether the purchased-coal clause violates § 8(e) in order to determine whether to enforce the clause. As the Court recently stated with respect to a statute which also provides that contracts which violate it are "void," "[a]t the

very least Congress must have assumed that [the statute] could be raised defensively in private litigation to preclude the enforcement of . . . [a] contract." *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 18 (1979). Therefore, where a § 8(e) defense is raised by a party which § 8(e) was designed to protect, and where the defense is not directed to a collateral matter but to the portion of the contract for which enforcement is sought, a court must entertain the defense. While only the Board may provide affirmative remedies for unfair labor practices, a court may not enforce a contract provision which violates § 8(e). Were the rule otherwise, parties could be compelled to comply with contract clauses, the lawfulness of which would be insulated from review by any court.

## IV

On September 26, 1980, nine days after the Court of Appeals issued the decision under review, Congress enacted legislation which respondents argue established a special rule governing the availability of illegality defenses in actions for delinquent contributions brought by pension fund trustees. It is urged that Congress intended to preclude employers from raising defenses such as those Kaiser has attempted to raise here. Section 306(a) of the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1295, added § 515 to ERISA, which provides:

> "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U. S. C. § 1145 (1976 ed., Supp. V).[9]

---

[9] The dissent rests entirely on § 306(a). It does not suggest that absent § 306(a), the purchased-coal clause would not be subject to the defense that its enforcement is forbidden by both the antitrust and labor laws.

The provision which was eventually enacted as § 306(a) was added to S. 1076 by the Senate Committee on Labor and Human Resources. The Committee explained that the provision was added because "simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions," and steps must be taken to "simplify delinquency collection." Senate Committee on Labor and Human Resources, S. 1076—The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 96th Cong., 2d Sess., 44 (Comm. Print, Apr. 1980) (1980 Senate Labor Committee Print) (emphasis added). During floor debate, Senator Williams and Representative Thompson[10] explained the purpose and meaning of § 306(a) in the same language used in the Senate Labor Committee Print. Both legislators also stated that they endorsed cases such as *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459 (1960); *Huge* v. *Long's Hauling Co.*, 590 F. 2d 457 (CA3 1978), cert. denied, 442 U. S. 918 (1979); *Lewis* v. *Mill Ridge Coals, Inc.*, 298 F. 2d 552 (CA6 1962); and disapproved cases such as *Washington Area Carpenters' Welfare Fund* v. *Overhead Door Co.*, 488 F. Supp. 816 (DC 1980), appeal pending, No. 80–1501 (CADC), and *Western Washington Laborers-Employers Health and Security Trust Fund* v. *McDowell*, 103 LRRM 2219 (WD Wash. 1979), appeal pending, No. 80–3024 (CA9).[11]

Assuming, *arguendo*, that the 1980 Amendments are applicable to this case, they do not alter the result. Far from abolishing illegality defenses, § 306(a) explicitly requires employers to contribute to pension funds only where doing so

---

[10] Senator Williams was Chairman of the Senate Committee on Labor and Human Resources and floor manager of S. 1076, the Senate counterpart of H. R. 3904, which became the Multiemployer Pension Plan Amendments Act of 1980. Similarly, Representative Thompson was Chairman of the House Education and Labor Committee and floor manager of H. R. 3904.

[11] 126 Cong. Rec. 23039 (1980) (remarks of Rep. Thompson); *id.*, at 23288 (remarks of Sen. Williams).

would not be "inconsistent with law." Even if § 306(a) were construed as completely embracing the views expressed by Senator Williams and Representative Thompson, the statute would not require prohibiting Kaiser from raising defenses to the purchased-coal clause. The legislators did not say that employers should be prevented from raising all defenses; rather they spoke in terms of "unrelated" and "extraneous" defenses.[12] As the United States points out in its brief, none of the cases the legislators endorsed "involved the enforcement of a contribution clause that itself was alleged to violate the law." Brief for United States as *Amicus Curiae* 28 (footnote omitted). Neither *Lewis* v. *Benedict Coal Corp.*, *supra*, *Huge* v. *Long's Hauling Co.*, *supra*, nor *Lewis* v. *Mill Ridge Coals, Inc.*, *supra*, involved a defense based on the illegality of the very promise sought to be enforced.

Respondents' contention that § 306(a) permits only one defense to be raised in suits to recover delinquent contributions—that the making of the payment itself violates § 302(a) of the LMRA—must be rejected for another reason. Respondents' argument necessarily assumes that in enacting § 306(a), Congress implicitly repealed the antitrust laws, the labor laws, and any other statute which might be raised as a defense to a provision in a collective-bargaining agreement requiring an employer to contribute to a pension fund. Since "repeals by implication are disfavored," *Allen* v. *McCurry*, 449 U. S. 90, 99 (1980), "'the intention of the legislature to repeal must be clear and manifest.'" *TVA* v. *Hill*, 437 U. S. 153, 189 (1978), quoting *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). The statutory language provides no basis for implying such a repeal, and nowhere in the legislative history is there any mention that § 306(a) might conflict with other laws.[13]

---

[12] *Ibid.* (remarks of Sen. Williams); *id.*, at 23039 (remarks of Rep. Thompson); *id.*, at 20180 (colloquy between Sen. Williams and Sen. Matsunaga). See also 1980 Senate Labor Committee Print, at 44.

[13] According to the dissent, Congress intended to permit a union to extract a promise from an employer that would be illegal under the antitrust

The judgment of the Court of Appeals is reversed,[14] and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

The salient facts of this case are not sufficiently stressed in the Court's opinion, and thus bear repeating. Kaiser Steel Corporation and the United Mine Workers (UMW) entered into a collective-bargaining agreement in 1974. As a part of that agreement, Kaiser promised to make contributions to certain UMW-designated employee health and retirement plan funds, based in part upon the amount of coal purchased by Kaiser from non-UMW mines. This purchased-coal

---

and labor laws as long as the promise is to pay money to pension fund trustees. Under this view, the defense of illegality would be unavailable during the life of the contract; it would be of no avail to the employer to secure a declaratory judgment that its promise violated federal statutes. The promise would still be enforceable, the effect being that the antitrust and labor laws would be suspended for the life of the contract. The dissent concedes that § 306(a) itself does not support this result. It instead relies on scraps of legislative history to work its partial repeal of the antitrust and labor laws. We are unconvinced that Congress intended any such result.

It should also be pointed out that Kaiser paid all sums that were anticipated in calculating the needs of the trust funds. The purchased-coal clause was not taken into account in providing trust fund revenues. We are unpersuaded that Congress intended to give pension fund trustees the benefit of illegal bargains that were not, and should not have been, relied upon to ensure the solvency of the trust funds.

[14] Because attorney's fees are normally awarded only to prevailing parties, the award of attorney's fees to respondents is also reversed. The Court of Appeals held that the District Court had jurisdiction over this action pursuant to § 502 of ERISA and did not abuse its discretion in awarding attorney's fees under § 502(g). That section permits a court to "allow a reasonable attorney's fee and costs of action to either party" in an action brought under § 502. Petitioners contend that this is not a suit to enforce ERISA, it cannot be brought under § 502, and therefore there is no authority for an award of attorney's fees. It is unnecessary to reach this issue.

clause obviously had value to Kaiser's UMW employees, because the agreement provided that if that clause were adjudged illegal, then the union could demand renegotiation of the contract in order to secure a *quid pro quo* for the invalidated clause. During the life of the contract, from 1974 to 1977, Kaiser's UMW employees fully performed their obligations under the contract. Kaiser, in contrast, did not pay a penny of the money that it had promised to pay under the purchased-coal clause. Instead, Kaiser failed to disclose the fact that it had purchased outside coal to which the clause applied, in plain violation of the reporting requirements of the 1974 agreement. In 1978—after Kaiser's UMW employees had lost their opportunity to renegotiate the 1974 agreement, and after they had fully performed their part of that bargain—Kaiser for the first time interposed its claim of illegality as a defense to respondent trustees' suit to recover the moneys promised to their plan under the purchased-coal clause.

" 'It has been often stated in similar cases that the defence [of illegality] is a very dishonest one, and it lies ill in the mouth of the defendant to allege it . . . .' " *Kelly* v. *Kosuga*, 358 U. S. 516, 519 (1959), quoting *McMullen* v. *Hoffman*, 174 U. S. 639, 669 (1899). This observation is peculiarly apt in the present case. The defense of illegality lies ill indeed in the mouth of the Kaiser Steel Corporation. In my view, this case exemplifies the very sort of abuse that Congress intended to stop with the enactment of § 306(a) of the Multiemployer Pension Plan Amendments Act of 1980.[1]

---

[1] 94 Stat. 1295.

The Court expresses doubt that § 306(a) is applicable to this case. *Ante,* at 87. But there is no basis for such doubt. Ever since *United States* v. *Schooner Peggy,* 1 Cranch 103, 109 (1801), we have recognized that "the court must decide according to existing laws." Recently, in *Bradley* v. *Richmond School Board,* 416 U. S. 696, 711 (1974), we reaffirmed our adherence to that rule, holding that an appellate court is bound to "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to

## I

Section 306(a) of the 1980 Amendments reads as follows:

### "DELINQUENT CONTRIBUTIONS

"Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." Pub. L. 96–364, 94 Stat. 1295.

---

the contrary." Because there is no dispute that § 306(a) is now "in effect," we must apply that provision here, unless Congress intended to the contrary or unless doing so would be manifestly unjust.

There is absolutely nothing to indicate any legislative intention that § 306(a) was not to be applied to cases on appeal at the time of its enactment. Indeed, § 108(c)(1) of the 1980 Amendments, 94 Stat. 1267, made § 306(a) effective as of the date of enactment, indicating that Congress intended that provision to become applicable as soon as possible. Moreover, the legislative history of the Amendments suggests a congressional intention that § 306(a) *would* apply to pending appeals. The sponsors of the Amendments in both the Senate and the House, in explaining the intended effect of § 306(a), specifically disapproved of certain holdings that had been reached by lower federal courts and that were on appeal while the bill was pending. See 126 Cong. Rec. 23288 (1980) (remarks of Sen. Williams); *id.*, at 23039 (remarks of Rep. Thompson).

Nor would application of § 306(a) to the present case work any "manifest injustice" upon Kaiser, in the sense in which that term was used in *Bradley, supra.* The sort of "injustice" discussed in *Bradley* is that which "stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Bradley, supra,* at 720. Application of § 306(a) would hardly impose any "new and unanticipated obligations" upon Kaiser. On the contrary, application of § 306(a) could at most require Kaiser to make payments that it knew of, and indeed *agreed* to make, back in 1974, as part of a collective-bargaining agreement that has been fully performed by the other side. In my view, it would be a manifest injustice to *respondents*—and, more importantly, to Kaiser's UMW employees who are the intended beneficiaries of the purchased-coal clause—if this Court *failed* to apply § 306(a) to the case before it.

The statutory language evinces an unmistakable congressional intention that obligatory payments shall be made, except when those payments are inconsistent with law. It is upon the construction of the phrase, "inconsistent with law," that the application of § 306(a), and the outcome of this case, obviously depend. The Court construes cases decided before the enactment of § 306(a) as suggesting that courts would not enforce collectively bargained payment obligations tainted by "consequential" illegality—payments that would "lead to" situations condemned by law, or that would allow a party to "reap the fruits" of illegal collective-bargaining provisions. *Ante*, at 81–83. Thus *Kelly* v. *Kosuga, supra*, is read to require that an illegality defense should be entertained when "its rejection would be to enforce conduct that the antitrust laws forbid." *Ante*, at 82. In the Court's view, § 306(a) constitutes no more than a statutory endorsement of these earlier cases, calling for a broad construction of the "inconsistent with law" phrase that would comport with those cases.

The Court's view is plausible only if the legislative history of § 306(a) is ignored. That history demonstrates beyond dispute that Congress was deeply concerned about the pre-1980 financial instability of employee benefit plans, and that this undesirable state of affairs was largely attributed to delinquent contributions by employers to those plans. The legislative history also demonstrates that Congress expressly intended § 306(a) to simplify and expedite plan trustees' suits to recover contractually required but delinquent employers' contributions, and that Congress chose to do so by, *inter alia,* substantially narrowing the scope of illegality defenses available to employers sued by plan trustees for delinquent contributions. With the benefit of the legislative history, it is apparent that § 306(a) was designed to allow an employer to be relieved of a plan contribution obligation *only* when the payment at issue is *inherently* illegal—for example, when the payment is in the nature of a bribe. In sum, illegality defenses, once arguably available whenever the payment in

question could be connected with illegal activities or results, are now meant by Congress to be available only when the payment in question itself constitutes an illegal act. An examination of the legislative history of § 306(a) makes this narrowing intention crystal clear.

## II

The Court construes § 306(a) as merely declaratory of preexisting case law. This construction implicitly assumes that Congress was on the whole satisfied with the pre-1980 condition of employee benefit plan funds. But that assumption is clearly erroneous. Congress was seriously troubled by a perception that employee benefit plans were highly vulnerable to financial instability,[2] and it identified employers' delinquent contributions as a principal cause of that vulnerability. The Senate Committee on Labor and Human Resources concluded:

> "Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily

---

[2] The Senate Committee on Labor and Human Resources explained these concerns as follows:

*"Delinquencies of employers in making required contributions are a serious problem for most multiemployer plans.* Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of investment income that could have been earned if the past due amounts had been received and invested on time. Moreover, additional administrative costs are incurred in detecting and collecting delinquencies. Attorneys fees and other legal costs arise in connection with collection efforts.

"These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates. Moreover, in the context of this legislation, uncollected delinquencies can add to the unfunded liability of the plan and thereby increase the potential withdrawal liability for all employers." Senate Committee on Labor and Human Resources, 96th Cong., 2d Sess., 43–44 (unnumbered Comm. Print 1980) (emphasis added).

cumbersome and costly. *Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case.* Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." Senate Committee on Labor and Human Resources, 96th Cong., 2d Sess., 44 (Comm. Print 1980) (emphasis added).[3]

Thus Congress' paramount concern in enacting § 306(a) was to expedite and simplify the collection of delinquent contributions by plan trustees—in other words, to expedite and simplify the very kind of suit brought by respondents in the present case. To solve this problem, Congress decided, among other things, to narrow the legal defenses available to employers sued by plan trustees seeking to recover delinquent plan contributions. The comments of the sponsors of § 306(a) in both the Senate and the House bear out this interpretation.

In the House, Representative Thompson stated that "Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, *and without regard to issues which might arise under labor-management relations*

---

[3] The Committee went on to stress that:

"The public policy of this legislation to foster the preservation of the private multiemployer plan system mandates that provision be made to discourage delinquencies and simplify delinquency collection. The bill imposes a Federal statutory duty to contribute on employers that are already contractually obligated to make contributions to multiemployer plans. . . . The intent of this section is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies." *Ibid.*

*law—other than 29 U. S. C. 186.*"   126 Cong. Rec. 23039 (1980) (emphasis added).   Title 29 U. S. C. § 186, entitled "Restrictions on financial transactions," essentially prohibits an employer from paying bribes to his employees, their representatives, or their union.[4]   In sum, the comments of Representative Thompson evince a congressional intention that employers sued by plan trustees should be able to interpose an illegality defense only if the claimed illegality resided *in the payment itself.*

In the Senate, Senator Williams stressed the same theme:

"It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises.   [P]lan participants for whom the employer promises to make pension contributions to the plan in exchange for their labor *are entitled to rely on their employer's promises.*   The bill clarifies the law in this regard by providing a direct ERISA cause of action against a delinquent employer *without regard to extraneous claims or defenses.*"   126 Cong. Rec., at 20180 (emphasis added).

---

[4] Section 186 reads in pertinent part:

"(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, any money or other thing of value—

"(1) to any representative of his employees . . . ; or

"(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer . . . ; or

"(3) to any employee or group or committee of employees of such employer . . . in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

"(4) to any officer or employee of a labor organization . . . with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization."

Senator Williams later restated his view of the defenses available to an employer under § 306(a), and implicitly defined his understanding of the term, "extraneous," by using precisely the same words as Representative Thompson had. *Id.*, at 23288.

The sponsors of § 306(a) thus intended to cut off all illegality defenses that an employer might previously have interposed against a plan trustee, except those that claimed an illegality falling within the prohibition of 29 U. S. C. § 186. Congress perceived that a plan trustee is merely a third-party beneficiary of the collective-bargaining agreement reached by an employer and its employees. Such a trustee does not take part in the negotiations that give rise to the employer's contribution obligation. Nor does that trustee have any influence over the performance of other aspects of the collective-bargaining agreement, which are —as § 306(a)'s sponsors put it—*"extraneous"* or *"unrelated to"* the employer's promise to contribute to the plan. From the trustee's point of view, the employer's promise to make contributions to the designated plan is distinct and severable from all the other clauses of the collective-bargaining agreement, and failure of the agreement in any other respect is wholly irrelevant to the employer's contribution obligation. In order to achieve its goal of expediting and simplifying delinquent-contribution suits brought by plan trustees, Congress through § 306(a) essentially adopted the trustee's point of view on this issue. To ensure the full funding of employee benefit plans, Congress provided that when an employer is sued for plan contributions due and owing under a collective-bargaining agreement, the only defenses that will be permitted are those, arising under 29 U. S. C. § 186, involving a claim of illegality inherent in the payment itself.

## III

The Court ignores this legislative prescription, thereby rendering § 306(a) a nullity and frustrating Congress' desire

to protect the economic integrity of the retirement, health, and unemployment plans upon which so many working people rely. The majority devotes little time or effort to its analysis of § 306(a), and its conclusion that that provision was intended merely to be declaratory of pre-existing law conflicts with the legislative history of § 306(a) in significant respects.

The Court does not explain why the modest, declaratory intention that it attributes to Congress is nowhere expressed in the legislative history of § 306(a). Nor does the Court even begin to reconcile its view of the limited purpose of § 306(a) with Congress' manifest concern for the financial vulnerability of employee benefit plans, or with Congress' express desire to simplify and expedite suits brought by plan trustees. The Court's position apparently is that Congress expected a mere statutory endorsement of existing case law to remedy the serious problems to which the 1980 Amendments were explicitly addressed. But simply to state this position is to expose its incredibility. The very fact that Congress perceived difficulties in the status quo, and sought to remedy them with § 306(a), demonstrates that that provision was *not* intended merely to express satisfaction with existing law, but rather was designed to narrow substantially the scope of defenses available to employers.

This conclusion naturally leads to, and in turn explains, Senator Williams' and Representative Thompson's explicit limitation of the defenses available under the new provision to those arising under 29 U. S. C. § 186. The Court, however, disregards these explicit limiting statements on the ground that "repeals by implication are disfavored," and that therefore "the intention of the legislature to repeal must be clear and manifest." The Court's reasoning is not even superficially persuasive. It is obvious that the Sherman Act is not "repealed" by § 306(a). The new provision merely channels the availability of the antitrust laws into employers' suits for declaratory and injunctive relief or for damages, the remedies normally afforded by those laws. See *Huge* v. *Long's*

*Hauling Co., Inc.*, 590 F. 2d 457, 465 (CA3 1978) (concurring opinion). And—with respect to § 8(e) of the National Labor Relations Act—even if § 306(a) is construed as a partial repealer, the record before us presents plenty of "clear and manifest" evidence that Congress intended to effect such a repeal: if the Court would only address that evidence. There is Congress' express dissatisfaction with the current state of affairs respecting employers' contributions to employee benefit plans; there is Congress' express intention to simplify and expedite trustees' suits to recover contractually required but delinquent employers' contributions; and there is explicit legislative history, offered by the sponsors of the legislation, disclosing the limiting device—a cross-reference to 29 U. S. C. § 186—actually chosen by Congress in order to effect its stated purpose. By demanding more evidence than this, the Court simply imposes its own view of the wisdom of § 306(a) upon Congress and upon respondents, in the guise of judicial restraint.

### IV

The legislative history of § 306(a) makes it plain that the judgment of the Court of Appeals below, affirming the District Court's rejection of the illegality defenses proffered by petitioner Kaiser, should be affirmed by this Court. Kaiser's defenses do not attack the legality of the delinquent plan contributions themselves. Indeed, Kaiser does not even attempt to argue that the overdue payments sought by respondent trustees are inherently illegal. Rather, Kaiser contends that the making of those payments would "lead to" an illegal restraint of trade, or would allow the trustees to "reap the fruits" of an illegal "hot cargo" clause. Whatever the merits of these contentions of consequential illegality, § 306(a) renders them quite irrelevant to Kaiser's obligation to make its promised contributions to the designated employee benefit plan funds. That was the very purpose of § 306(a).

This conclusion does not impair Kaiser's rights vis-à-vis the UMW, nor does it undercut the important national policies embodied in the Sherman Act and § 8(e) of the National Labor Relations Act. Kaiser can easily transform both of its illegality claims into causes of action brought directly against the union. "The employer may still have its claims adjudicated by bringing, in the proper forum, a timely suit against the union for rescission of the contract, antitrust damages, or a declaration that an unfair labor practice has been committed . . . ." *Huge, supra,* at 465 (concurring opinion).[5] Section 306(a) simply distinguishes Kaiser's rights against the union from its rights against respondents. In its effort to assure financial stability to employee benefit plans, § 306(a) prescribes the insulation of plan trustees—such as respondents—from the potentially never-ending disputes between labor and management.

Because I believe that § 306(a) of the 1980 Amendments requires affirmance of the judgment of the Court of Appeals, I dissent.

---

[5] The *Huge* decision was specifically endorsed by the sponsors of § 306(a) in both the Senate and the House. See 126 Cong. Rec. 23288 (1980) (remarks of Sen. Williams); *id.,* at 23039 (remarks of Rep. Thompson).