PORT GIBSON, MISSISSIPPI, WHITMAN "GRADY" MAYO SCHOLARSHIP FOUNDATION, INC.

v.

UNITED STATES of America.

Civil Action No. 5:94–CV–137.

United States District Court,
S.D. Mississippi,
Western Division.

March 7, 1996.

Craig D. Bluntson, Frank D. Stimley, Jackson, MS, for Port Gibson, Mississippi Whitman "Grady" Mayo Scholarship Foundation, Inc.

Mitzi Dease Paige, U.S. Attorney's Office, Jackson, MS, for U.S.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRAMLETTE, District Judge.

This is a lease contest initiated by Plaintiff, Port Gibson, Mississippi, Whitman "Grady" Mayo Scholarship Foundation, Inc., seeking declaratory judgment validating the lease, responded to by the Defendant, United States of America, in the form of an answer and counterclaim which seeks cancellation of the lease, eviction of the Plaintiff and damages.

Plaintiff, Port Gibson, Mississippi, Whitman "Grady" Mayo Scholarship Foundation, Inc., (hereinafter the "Foundation") is a domestic corporation organized and incorporated under the laws of the State of Mississippi with its principal place of business in Port Gibson, Mississippi. This non-profit corporate entity was established as a foundation to assist the homeless and needy in a 12–county area of Southwest Mississippi.

The United States of America owns a federal building and post office in Port Gibson which qualified as surplus property. Title V of the Stewart B. McKinney Homeless Assistance Act (Title V) (42 U.S.C. § 11411) provides that certain unutilized, underutilized, or surplus federal property may be made available to certain public agencies and non-profit private entities for assistance to homeless persons. Once such a determination is made the property is apparently reported to General Services Administration (hereinafter "GSA") as "excess," and if the property is not needed by any federal agency it is then classified as "surplus," and under certain regulations which are not entirely clear to the Court the Department of Health and Human Services (hereinafter "HHS") which is an agency of the United States of America may then lease the property to a homeless assistance group, agency or foundation.

Title V requires publication in the *Federal Register*, and appropriate applications must be made by prospective lessees.

On or about March 31, 1989, the Foundation submitted an application to lease a two-story building known as the Federal Building and Post Office on Orange and Market Streets, Port Gibson, Mississippi, which building stands on approximately .75 acres of land. The application states that if successful, the applicant will maintain insurance on the premises during the terms of the lease and shall maintain the premises in conformance with the standards prescribed by GSA in its regulations FPMR 101–47, 4913 (41 C.F.R. 101).

On February 1, 1990, the United States of America acting by and through the Secretary of Health and Human Services (Lessor) entered into a lease agreement to and with Port Gibson, Mississippi, Whitman "Grady" Mayo Scholarship Foundation, Inc. (Lessee). The lease has a primary term of ten years and is renewable, with mutual consent, for an additional ten year term. Among the obligations of the Lessee are the following:

1. Property shall be used continuously for public health purposes only and for no other purpose except as may be agreed to in writing. There will be no subletting of the premises.

2. On an annual basis the Lessee will file a report on the operation and maintenance of the property.

3. Lessee at its expense shall protect, preserve, maintain and repair the leased property in a condition at least comparable to that existing at the time of the inception of the lease subject, however, to ordinary wear and tear.

4. Lessee shall maintain at its expense a standard fire and extended coverage policy to the full insurable value of the building, and in addition will maintain "general public liability insurance" with limits of not less than $200,000 for each person and $500,000 for each occurrence and with property damage coverage of not less than $25,000 for each accident.

Failure to adhere to these requirements constitutes a breach, and in the event of such, Lessee has the option to terminate the lease and immediately reenter the premises.

The following witnesses testified for the Plaintiff:

Evan Doss, Jr., Tax Assessor of Claiborne County and President and Chief Executive Officer of the Whitman "Grady" Mayo Scholarship Foundation, Inc.

The following witnesses testified for the Defendant:

Jim Denson, Assistant Field Office Manager with General Services Administration, Jackson, Mississippi.

Eula M. Samuel, Realty Specialist with the Department of Health and Human Services, Rockville, Maryland.

Brian J. Rooney, Acting Director, Health Facilities Planning, Public Health Division, Department of Health and Human Services, (Realty Specialist), Rockville, Maryland.

Prior to August 24, 1994, there were a series of telephone calls and conferences initiated by the Counter/Plaintiff to Evan Doss, Jr., Plaintiff's representative. It was the mission of these calls and letters to inform the Plaintiff that the terms and conditions of the lease were being violated by Lessee's failure to protect, preserve, maintain and repair the leased premises, and by failure to pay Lessee's share of the cost of utilities. The Court notes that there is no requirement in the lease for the Lessee to share utility costs, and there will be further comment regarding this matter. There was testimony that there were promises made by the Plaintiff regarding the sharing of utilities, but there is nothing either in the lease or elsewhere, other than sworn testimony to support this claim. Therefore, the Court will concentrate on the other alleged lease violations.

On August 24, 1994, Kathleen Furney Martin, the Director of the Division of Health Facilities Planning, Department of Health and Human Services, notified Lessee through its representative, Evan Doss, Jr., that because of Lessee's breach of the terms of the agreement, the lease was terminated, effective 30 days from date of receipt. By follow-up correspondence on September 29, 1994, Ms. Martin advised that the effective date of the cancellation was September 30, 1994, and that the premises must be vacated by that time. On October 6, 1994, the Foundation lodged its complaint in the Circuit Court of Claiborne County, Mississippi, seeking declaratory relief in the form of a judgment declaring that the Plaintiff performed all required obligations under the document and the lease is, therefore, valid. On November 9, 1994, the suit was removed by the United States of America to the United States District Court for the Southern District of Mississippi. In its answer and counterclaim, the Defendant and Counterclaimant

seeks a declaration from the Court that the Plaintiff has violated the terms of the lease, that the lease was legally and effectively cancelled and terminated by the Counter/Plaintiff, that the Plaintiff be immediately evicted from the premises, that the Counter/Plaintiff be allowed to immediately re-enter the premises, and that the Counter/Plaintiff be awarded damages in an amount necessary to return the property to a condition comparable to that existing at the time of the inception of the lease.

The Court will focus on two issues. First, has the Lessee maintained the premises in a condition comparable to that existing at the time of the inception of the lease, and secondly, has the Lessee complied with the insurance requirement, i.e., the continuous coverage for general liability as well as fire protection?

■ Regarding the issue of insurance, the Plaintiff concedes that there has not been continuous insurance coverage on the leased premises. From time to time policies have lapsed, although it is the Plaintiff's position that at the time of termination, August 24, 1994, coverage was in effect. The Plaintiff admits, however, that on the date of trial, December 4–5, 1995, there was neither fire nor liability coverage.

Unnumbered paragraph 2 of page 5 of the lease contract provides that upon termination of the lease under its own terms or upon early termination by Lessor and prior to surrender of the premises, all obligations of the Lessee shall remain in full force and effect, including the insurance obligation, "until such time as actual possession is taken by the Lessor." This paragraph contemplates the giving of a 30 day notice by the Lessor and the surrender at the end of the 30 day period. However, under the circumstances *sub judice* the Plaintiff initiated a suit seeking declaratory relief, and during the pendency of this legal action Lessee has continued to occupy the premises. Any reasonable interpretation of the lease document leads to no other conclusion than the absolute obligation of Plaintiff to maintain insurance coverage, which it has not done. For this reason, the Court finds that the contract has been breached, and the Counter/Plaintiff has effectively terminated the lease contract.

■ As to the issue of premises maintenance the Court finds that there has been a general deterioration of the subject property which greatly exceeds depreciation occasioned by normal and expected wear and tear. The Court has carefully considered videos, one of which was made in May, 1990, only a few months after the building was occupied by the Plaintiff. It was the apparent purpose of this video, which was made at the instance of either GSA or HHS, to depict a deterioration of the building over the preceding several months. Upon questioning by the Court, Defendant's and Counter/Plaintiff's witness, Jim Denson, could give no testimony as to whether the condition of the premises as shown by the 1990 video was the same as the condition which existed at the beginning of the lease in February of 1990. It is the position of the Plaintiff that the condition was basically the same and that, therefore, there were problem areas with the building when the lease began. No doubt this is true. On the other hand, the overwhelming evidence leads the Court to the inescapable conclusion that since the beginning of the lease, February 1, 1990, this federal building has been subject to neglect and inattention which has caused an overall deterioration of this property to the point of lease violations.

For months there were complaints about a leaking roof and a faulty air conditioning system. After suit was filed the roof was repaired at a cost of $14,750, and the air conditioning system was replaced at a cost of $17,595. This was done at the expense of the State of Mississippi by way of a grant obtained by Mr. Doss and/or the Foundation. It is regretful that those who were in charge of these public funds did nothing to insure that the Lessee would maintain the premises in accordance with the mandates of the lease to insure that these trust funds would be used for the apparent purposes intended, i.e., the health and welfare of homeless and poverty stricken people. As it has developed, these funds which were used on the subject property could have well been used elsewhere and under circumstances which would

inure to the benefit of homeless persons. As it is, these rather substantial monies have gone to make improvements upon a building which will now revert to the government because of the carelessness of the Foundation to which the funds were entrusted.

Nevertheless, the roof and air conditioning improvements were done to the satisfaction of GSA.

■ The Court finds, as said, that there has been a general deterioration of the building since the government inspection of 1992 down through and including 1995. The parties concede that there have been improvements in recent months, and particularly since the termination of the lease and after the filing of suit by the Plaintiff. But these belated efforts, under the law, cannot reclaim or reinstate a lease contract which was effectively terminated by letter of August 24, 1994.

Eula M. Samuel testified and the Court finds as fact that there was a litany of demands and requests made by the HHS upon the Plaintiff and more specifically upon its representative, Mr. Doss. These came in the form of telephone calls and letters, demanding lease compliance. The Court finds the testimony to be uncontroverted and that Mr. Doss, on many occasions, failed to respond to Ms. Samuel and others, failed to file reports required by the lease, failed to heed warnings of lease violations including current insurance coverage and maintenance.

The Court recognizes that in a homeless environment with comings and goings of residents and their children and the likelihood of vandalism, property destruction and malicious mischief, the Plaintiff could not be expected to maintain a perfect premises. At any given time an unannounced inspector would be likely to find some degree of property defacement, and all doubts in this regard would be resolved by the Court in favor of the Lessee. However, as stated, the evidence indicates a continuous course of neglect of the property. As shown by the photographs in Exhibits G40 and G41, compared to the videos, the Court finds the following items of general decay which go far beyond ordinary wear and tear and which have occurred since 1990, to-wit:

(a) All exit lights for fire protection are non-functional.

(b) Covers have been removed from electrical outlets, exposing residents to electrical shock.

(c) Fire extinguishers are non-functional and have either been dissipated by use or by time.

(d) Floor tile is missing and the condition is worse now than in 1992.

(e) Ceiling tile is damaged and missing.

(f) There is sheet damage to plaster, primarily on the wall areas. This creates a health hazard because of the tendency of deteriorating plaster to absorb moisture and germs.

(g) There is dirt buildup around the ventilation system.

(h) Bathroom facilities, primarily commodes, are non-functional, unhealthy and unsanitary.

(i) Smoke detectors are inoperable.

(j) The outside of the building shows discoloration by rust fading down the sides of the building, and the metal staircase is unpainted and rust pocked.

(k) A shower was installed after the lease began. There is leakage in and about the shower causing floor damage, discoloration and tile failure.

As stated previously, there have been improvements since the filing of suit by Plaintiff for declaratory judgment. Aside from the air conditioning and roof repairs Plaintiff has made improvements on the building's interior. Specifically there has been painting, some tile repair and some plaster repair. The Court finds that most of this is cosmetic and of poor quality. The wall surfaces have been patched and are jerry-built.

Concluding, the Court finds that any fair minded inspection of this premises would lead to the inescapable conclusion that at the time of the cancellation of the lease, this federal building had deteriorated far beyond ordinary depreciation and was in a state of negligent disrepair and deterioration and in places was unhealthy, unsafe and unsanitary.

The Court finds that any reasonable landlord under these conditions would be justified in cancelling the lease contract. The Defendant and Counter/Plaintiff in this case was justified in cancelling the lease because of the failure of the Lessee to abide by the terms of the contract. Moreover, the Lessee was uncooperative, unresponsive and often times elusive. The Lessor made every effort to encourage lease compliance by the Plaintiff, and the Court documents show that extensive efforts were made by HHS to perpetuate the lease and to encourage Lessee to comply with the required standards. Numerous trips made from Rockville, Maryland, numerous telephone calls and letters and various inspections, videos and photographs all attest to the efforts of the Defendant and Counter/Plaintiff to encourage the Foundation and Mr. Doss to bring the building within compliance. On one occasion the representatives of the Defendant were refused admission into the building for an inspection until Mr. Doss was contacted and gave his consent.

Once the representatives gained entry, photographs were taken of campaign posters for Evan Doss, Jr., who apparently was running for Supervisor of Claiborne County at the time. These posters were neatly stacked in an office area, although Mr. Doss testified that their purpose was to provide children cardboard and paper to use in making paper figurines, etc.

The Court will briefly comment upon two matters upon which the United States of America, through counsel, focused at trial. Initially, we find that these two matters although considered by the Counter/Plaintiff as being lease violations are not such that, standing alone, would invalidate the subject contract. First, there is the matter of utilities. The lease contract is silent on this subject. Who is to pay utilities during the term of the lease? There is evidence which states that through error, the matter of utilities was omitted from the contract. The Court accepts this as true. It is inconceivable that the United States of America would enter into a ten year lease contract, receive absolutely no rent and agree to pay all utilities, without limitation. Through testimony and reasonable inferences taken therefrom, apparently the utility issue was complicated by the fact that a portion of this federal building was to continue to be used by the United States Postal Service, and separate metering of the utilities would be very expensive. But following the execution of the lease there were demands by the Counter/Plaintiff upon Mr. Doss, requiring proration of utility costs. Testimony shows that this was a verbal agreement made by and between the parties, although Mr. Doss and the Plaintiff never met their verbal obligation, according to the testimony. Exhibit G13 indicates that utility costs attributable to the Lessee exceed $923 per month, and that periodic demands were made for payment. None were received.

Complicating this unfortunate and rather startling situation is the fact that without prior approval, Evan Doss, Jr., installed radio equipment in the subject premises and commenced the operation of a radio station which he conceded was a "for profit" business. Demands were made for Mr. Doss to remove the radio station. By letter of February 24, 1994, (Exhibit G22) Mr. Doss submitted an official request for approval of the radio equipment and radio station which was designed, according to his letter, to aid and assist homeless individuals. Obviously, inasmuch as this was not a non-profit business enterprise the purpose of the station was also to aid and assist Mr. Doss and/or any other investors. Subsequently, for reasons which are unclear to the Court, the Lessor granted Lessee permission to leave the station in place, and, therefore, the Court finds that although the radio station was a rather blatant lease violation this breach was subsequently waived by the Counter/Plaintiff. What is troubling to the Court, however, is the fact that the utilities for this station were apparently paid by the United States of America. There is no evidence to the contrary. On cross examination by the Plaintiff of one of the Defendant and Counter/Plaintiff's witnesses, the question was asked if it were not true that the radio station was connected to a separate tower. The answer was unresponsive. The record, therefore, was devoid of any guidance as to who paid the utilities for this private enterprise.

Without question a portion of the utilities, including lights, electricity, air conditioning, etc., was paid by the government.

The government found itself in the position of providing utilities for private enterprise which was housed in a homeless shelter. This is as unfortunate as it is irresponsible. Governmental response to the needy is the moral obligation of any society, especially so in this land of plenty. But, unfettered governmental largess to private enterprise in the form of rent free, utility free housing for private enterprise has no explanation in the record of this case and is therefore as suspect as it is unexplained.

The Court finds that the Plaintiff breached the subject lease by failing to protect preserve, maintain and repair the leased property in a condition at least comparable to that existing at the time it entered into the lease. The Defendant was therefore entitled to terminate the lease pursuant to its terms, which it did by sending a letter of intent to terminate on August 24, 1994, and by notifying the Plaintiff of the effective date of termination, September 30, 1994. The Court also finds that by subsequently failing to maintain insurance on the subject premises, as contemplated by the lease, the Plaintiff committed a further breach of the contract.

■ There is no statutory code of federal contract law, but Supreme Court cases leave no doubt that public policy is a proper consideration for this Court in deciding whether to enforce the termination provisions of the subject lease. *See Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 77, 102 S.Ct. 851, 856, 70 L.Ed.2d 833 (1982), *citing McMullen v. Hoffman,* 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1899), and *Continental Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909). The Restatement of Contracts 2d § 179 (1981) provides that "[a] public policy against the enforcement of [a contract] may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare...."

■ "[T]he usual and most important function of courts of justice is ... to maintain and enforce contracts, [rather] than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the general welfare." *Smithy Braedon Co. v. Hadid,* 825 F.2d 787, 791 (4th Cir.1987) (quoting *Baltimore & Ohio Southwestern Railway Co. v. Voigt,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)).

■ Our society depends on the ability of parties to contract with certainty. Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, this certainty would be placed in jeopardy. The power to refuse to enforce contracts on the ground of public policy is therefore limited to occasions where the contract would violate "some explicit public policy" that is "well defined and dominant, and [which] is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (quoting *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).

■ This Court's duty is to enforce the provisions governing termination of the lease, unless enforcement is forbidden by existent legislation or legal precedent. Finding no public policy that would forbid enforcement of the lease, the Court is bound to enforce the termination provisions made by the parties.

In conformity with this opinion the Defendant, Counter/Plaintiff shall prepare a judgment and submit it to the Court within ten (10) days, in compliance with this opinion. The Judgment shall declare the lease cancelled, shall order immediate eviction of the Plaintiff, and shall award costs to the Defendant, Counter/Plaintiff. In its pleadings the Defendant, Counter/Plaintiff seeks damages in an amount to be determined upon a survey of the property. Damages having not been specified during the trial, same shall not be contained in the judgment order but may be brought to the attention of the Court for

further resolution at the proper time upon appropriate pleadings being filed.