**PIPE FITTERS HEALTH AND WELFARE TRUST, PIPE FITTERS PENSION TRUST AND PIPE FITTERS LOCAL UNION NO. 562; John Marshall, administrator and fiduciary of all plaintiff funds; Lester Grossl, Joe Barry; Don Devitt and Robert McDonald, trustees, Appellants,**

v.

**WALDO, R. INC., R. Waldo, Inc., and Russell Waldo, Individually, Appellees.**

No. 88–1230.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 22, 1988.

Decided April 17, 1989.

Rehearing Denied July 6, 1989.

John H. Goffstein, Clayton, Mo., for appellants.

John W. Ellinger, Jefferson City, Mo., for appellees.

Before HEANEY,* Circuit Judge, ROSS, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Pipefitters Health and Welfare Trust, Pipefitters Pension Trust, and Pipefitters Local Union No. 562 (collectively Pipefitters), brought suit under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132 and 1145, and section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) to collect funds allegedly owed by the appellees, Waldo, R., Inc., R. Waldo, Inc. and Russell Waldo. Pipefitters allege that both companies and Waldo are liable for wages and contributions to employee benefit funds due under two consecutive collective bargaining agreements. Pipefitters challenge the district court's finding that the contract was illegal and unenforceable. We reverse and remand.

## BACKGROUND

Russell Waldo owns two construction companies, R. Waldo, Inc. and Waldo, R., Inc. Both companies are engaged in the business of mechanical contracting, such as plumbing, heating, air conditioning and underground piping. R. Waldo, Inc. had for several years negotiated collective bargaining agreements with the Congress of Independent Unions (CIU) covering all of the company's employees. The relevant collective bargaining agreement was in effect from 1981 to April 15, 1984. The agreement, ratified by the company's employees, provided that CIU would be the exclusive bargaining representative for all of R. Waldo's employees. It contained a union security clause, but no provision requiring the company to pay union dues or initiation fees to CIU.

In 1982, a business representative of Pipefitters had contact with some of the R. Waldo's employees about becoming members of Pipefitters. James O'Mara, another union representative, then contacted Russell Waldo about signing a collective bargaining agreement with Pipefitters. Waldo created a second corporation, Waldo, R., Inc., for the purpose of bidding for projects which required an AFL–CIO union work force, signed a collective bargaining agreement on behalf of Waldo, R., and then transferred eight of his employees to Waldo, R. Waldo promised O'Mara and the remaining employees that he would phase out R. Waldo operations as the work bid by that company was completed, and its employees could join Pipefitters when the CIU agreement expired in 1984.

Waldo, however, did not run the two construction companies as he had promised. Waldo, R. never bid on any projects and never had any work other than what it subcontracted from R. Waldo. Both corporations were owned and operated by Russell Waldo. They were run out of the same office with the same personnel. The construction workers were paid from the same source, worked on the same projects and used the same equipment. The only difference between the two groups of employees was that employees of R. Waldo were paid pursuant to the CIU contract, and those of Waldo, R. were paid on the basis of the Pipefitters contract.

Pipefitters renewed its contract with Waldo, R. in 1983. This contract, effective from June 1, 1983, until May 31, 1986, contained provisions for direct payment to the union of initiation fees, dues and assessments,[1] and for contributions to an em-

---

* The Honorable Gerald W. Heaney assumed senior status on December 31, 1988.

1. Article 6, section 1, provided in part:
   It is understood and agreed that the Employer will deduct * * * Union initiation fees and current dues and assessments, from the paycheck of all employees who are covered by this Agreement, and who have signed written legal assignments * * *. The monies so deducted under such assignments shall be from each weekly paycheck. The Employer further agrees to remit to the Union, immediately after the checkoff payday, all money so deducted from the paychecks of employees covered by this agreement.

ployee health and welfare trust fund[2] and pension fund.[3] Waldo apparently made the contributions to the fund for the eight Waldo, R. employees.

In February of 1984, a business representative of CIU requested that Waldo negotiate a new CIU contract. Even though the R. Waldo employees unanimously voted against CIU representation, Waldo renewed the CIU three-year contract, with a wage scale far below that of Pipefitters.[4] This contract was never ratified by R. Waldo employees. Pipefitters then brought a charge of unfair labor practices against Waldo and the CIU. The NLRB found that Waldo had engaged in unfair labor practices by renewing the CIU contract after the CIU has lost its majority support, by unlawfully coercing and discriminating against employees and by giving unlawful support to the CIU. The 1984 collective bargaining agreement was invalidated as a result.

Meanwhile, Pipefitters brought this action in federal district court in an attempt to hold Waldo, R., R. Waldo, and Russell Waldo, individually, liable for violations of the Pipefitters contract. Pipefitters allege that since January 1, 1984, Waldo, R. diverted AFL–CIO work to the nonunion R. Waldo employees, resulting in a loss of $90,000 in union wages. Pipefitters also allege that the work diversion resulted in a loss of $18,630 in pension payments, $40,-805 in health and welfare payments, $9,000 in initiation fees, and $9,900 in union dues.

The district court refused to enforce the Pipefitters contract. First, the court held that Waldo was running a double-breasted operation and that Waldo, R. was the alter ego of R. Waldo, pointing to *Iowa Exp. Distribution, Inc. v. N.L.R.B.*, 739 F.2d 1305, 1310 (8th Cir.), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984), to support this conclusion. Second, it found that the Pipefitters contract was illegal as one employer may not negotiate a collective bargaining agreement with another union when his employees are already represented by a union. We believe the district court's decision is directly contrary to the findings of the National Labor Relations Board. We further believe that the existence of the CIU contract did not preclude Waldo from operating a split shop and from entering into a prehire agreement with Pipefitters covering the construction workers employed by Waldo R.

## DISCUSSION

### I. *Jurisdiction*

■ Pipefitters allege that the district court has no jurisdiction to consider Waldo's defense that the execution of the Pipefitters contract constituted an unfair labor practice. We agree with the district court that *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) gives it the authority to find collective bargaining agreements unenforceable if they violate federal labor law. As the Supreme Court recognized:

> As a general rule, federal courts do not have jurisdiction over activity which is "arguably subject to § 7 or § 8 of the NLRA," and they "must defer to the exclusive competence of the National Labor Relations Board." * * * [A] federal court has a duty to determine whether a

**2.** Article 14, section 2 of the Pipefitters contract provided in part:
  All Employers obligated to the terms and provisions of this collective bargaining agreement shall contribute, pay and remit to the Trustees of the Fund, at the office of the Fund, $3.53 per hour for each hour worked by each employee covered by this agreement * * *.

**3.** Article 15, section 2 of the Pipefitters contract provided in part:
  All Employers obligated to the terms and provisions of this collective bargaining agreement shall contribute, pay and remit to the Trustees of the Fund, at the office of the

Fund, $1.65 per hour for each hour worked by each employee covered by this Agreement * * *.

**4.** The CIU wage scale was far below Local 562's $16.95 union wage scale. The journeymen rate for plumbers and pipefitters in the CIU agreement that expired 15 April 1984 was $10.93 * * *. Among the Company's eight employees in the bargaining unit in April (all of whom were later accepted as Local 562 members), three were paid * * * about $11 or $11.25 an hour, and three, less than $10 an hour. *R. Waldo, Inc.*, 280 N.L.R.B. No. 135 at 2 (1986) (citations omitted).

contract violates federal law before enforcing it. * * * [A] court must reach the merits of an illegality defense in order to determine whether the contract clause at issue has any legal effect in the first place.

455 U.S. at 83–84, 102 S.Ct. at 859–60 (citations omitted).

Thus, if, in a section 301 action, an employer asserts that a collective bargaining agreement is unenforceable due to an unfair labor practice on the part of the union, a federal court has jurisdiction to rule on that defense. *But cf. Glaziers & Glassworkers v. Custom Auto Glass Dist.,* 689 F.2d 1339, 1343 (9th Cir.1982) (limiting jurisdiction to cases in which breach of contract constitutes unfair labor practice).

## II. *Illegality of the Pipefitters Agreement*

■ We believe that the Pipefitters contract with Waldo, R. was a prehire agreement, valid by reason of 29 U.S.C. § 158(f).[5] Section 8(f) allows an employer in the construction industry to enter into a collective bargaining agreement with a minority union. *NLRB v. Local Union No. 103, Intern. Ass'n of Bridges, Structural and Ornamental Iron Workers,* 434 U.S. 335, 345, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978); *Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan v. Associated Wrecking Co.,* 638 F.2d 1128, 1130 (8th Cir.1981). The enactment of this provision was in response to the particular needs of the construction industry.

During the Wagner Act period the Board declined to exercise jurisdiction over the [construction] industry. In 1947, after passage of the Taft–Hartley amendments, the Board applied the provisions of the Act to the industry with consequent difficulties. * * * In summary, prehire agreements which would otherwise be invalid were authorized in the construction industry because of the dual necessities (1) that construction bidders know in advance of bid what their labor costs would be, and (2) that construction employers have access to an available pool of skilled craftsmen for quick reference.

638 F.2d at 1131 (citations omitted).

It is true that Waldo, R. had no employees when it executed the Pipefitters contract in 1982. It is also true that Waldo, R. had not yet bid on any AFL–CIO projects. Yet, section 8(f) of the NLRA specifically allows an employer such as Waldo to enter into an agreement with a union in an attempt to assess his labor costs and to ensure an available work force *before* he bids on a project.

■ Although section 8(f) allows a construction employer to enter into a prehire agreement, this statutory provision says nothing about whether that employer may do so while bound by an earlier contract with another union. We believe that, under the unique circumstances of this case, no violation of the NLRA or public policy occurred when Waldo created his double-breasted operation and entered into the pre-hire contract with Pipefitters.

There is nothing in the NLRA which makes "double-breasted" operations illegal per se. It has become common practice for construction employers to establish separate companies, one working on union projects, and another to operate on a non-union basis. 1 Morris, *The Developing Labor Law* 676 (2ed. 1983). In *Carpenters'*

---

5. 29 U.S.C. § 158(f) provides in part:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, * * * *Provided,* that nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

*Local Union No. 1478 v. Stevens,* 743 F.2d 1271 (9th Cir.1984), the Court explained the purpose behind these operations:

> Such "double-breasted" operations allow a contractor to compete for both union and non-union work. The non-union company can bid competitively on jobs that do not require union contractors, while the union company continues to bid on jobs requiring union contractors.

*Id.* at 1275 (footnote omitted). The theory of such an operation is that union and nonunion firms compete in different and separate markets. *Road Sprinkler Fitters Local Union No. 669 v. N.L.R.B.,* 789 F.2d 9, 12 n. 2 (D.C.Cir.1986).

The National Labor Relations Board found that R. Waldo was considered a *nonunion* employer, paying *nonunion* wages under the 1981 CIU contract. 2 N.L.R.B. No. 135 at 2. It also found that Waldo set up Waldo, R. and transferred eight employees to that company in an effort to operate a union shop and to pay full union wages and benefits. *Id.* at 7. Waldo operated a "split" shop since 1982, with eight employees receiving union wages, and another group of employees receiving nonunion wages. *Id.*

Russell Waldo argues, however, that because Waldo R. was the alter ego of R. Waldo, neither company could legally enter into a contract with Pipefitters.

Although we agree with the district court that Waldo, R. became the alter ego of R. Waldo, we believe that Waldo cannot assert the alter ego doctrine as a method of avoiding his contractual obligations. First, this doctrine was established to protect the rights of employees, not employers. *See Iowa Exp. Distribution, Inc. v. N.L.R.B.,* 739 F.2d at 1310–11 (non-signatory company will be held liable to collective bargaining agreement of alter ego signatory company when company was formed for purpose of avoiding union contract). An employer who enters into an agreement with a union and makes payments to that union pursuant to the agreement cannot later deny this contractual obligation merely because it dealt with two unions. *Greater Saint Louis Const. v. Willmon Jeff.*

*Blacktop,* 582 F.Supp. 1106, 1109 (E.D.Mo. 1984), *aff'd,* 753 F.2d 648 (8th Cir.1985) (per curiam). Thus, the alter ego doctrine is unavailable under the circumstances of this case and Waldo cannot assert it as a means of avoiding a contract he freely entered into.

Second, the CIU, the union allegedly harmed by the Pipefitters contract, never challenged the contract's validity even though it lost members to Pipefitters in 1982. The CIU lost the right to invalidate the Pipefitters contract when it was abandoned by Waldo's employees. Furthermore, Pipefitters made no attempt to enforce its contract until after the CIU contract had expired by its own terms in 1984. The only group in a position to assert the alter ego doctrine to void the Pipefitters contract is the employees of R. Waldo and they will not complain as they *want* to be covered by this contract. Thus, enforcement of the Pipefitters contract in this case harms no one.

The Pipefitters contract was a legal prehire agreement, entered into for the legitimate purpose of providing union wages and benefits to the employees of Waldo, R. The NLRB did not find objection with Waldo's decision to operate a "split" shop and neither do we. Nothing prevents Waldo from establishing a company for the purpose of contracting to do union work, and nothing prevents Pipefitters from entering into a prehire agreement with the new corporation and to demand union wages for this work. In light of the fact that neither the CIU nor Waldo's employees sought to invalidate the Pipefitters contract and the fact that Waldo cannot assert the alter ego doctrine as a defense in this suit, we find that the Pipefitters collective bargaining agreement is enforceable.

We also believe that R. Waldo became bound by the terms of the Pipefitters contract upon the expiration of the CIU agreement on April 15, 1984. R. Waldo's employees expected this to occur and the NLRB found that Russell Waldo had promised to be so bound. Thus, any of Waldo's employees performing pipefitting or plumbing work after that date should have been

paid union wages. Payments to the union trust funds should also have been made, regardless of whether the employees were members of the Pipefitters union.[6]

We do not decide the issue of whether Russell Waldo may be held personally liable for the contractual obligations of R. Waldo and Waldo, R. We remand to the district court the issue of individual liability to be resolved in a manner consistent with this opinion.

We therefore reverse and remand to the district court for a determination of whether any money is owed to Pipefitters as a result of this opinion.

---

**6.** Article 14, section 2, and Article 15, section 2 of the Pipefitters contract provides that trust contributions shall be made regardless of whether the employee's name appears on the check-off list.