Erling W. ROCKNEY, Kenneth M. Knopf, Glendon K. Olson and Marvin E. Diers, Appellants,

v.

Gerard M. BLOHORN, Oliver A. Kimberly, Jr. and Does 1 through 10, Inclusive, Appellees.

No. 88–5194.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1988.

Decided June 6, 1989.

Denis E. Grande, Minneapolis, Minn., for appellants.

Robert E. Woods, St. Paul, Minn., for appellees.

Before HEANEY and BEAM, Circuit Judges, and STUART[1], Senior District Judge.

STUART, Senior District Judge.

This is an action by four retired executives of Pako Corporation (Pako) to collect from Gerald M. Blohorn and Oliver A. Kimberly, Jr., personally, benefits due them under Pako's unfunded "Top Hat" pension and deferred compensation agreements. Plaintiffs allege defendants are liable as control persons under the language of the agreements and under the definition of "Employer" contained in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA). After discovery was completed, defendants filed motions for summary judgment which Judge Renner[2] granted. Plaintiffs appealed.

According to appellants, the issues are:

1. Whether the district court erred in concluding that there was no dispute of material fact as to whether Blohorn exercised sufficient control over Pako to be individually liable as an "employer" under ERISA.

2. Whether the district court erred in holding that the express language of the relevant pension plans imposes no individual liability on Blohorn and Kimberly.

In reviewing an order granting summary judgment, we apply the same standard which governs the district court. *Umpleby v. United States*, 806 F.2d 812, 814 (8th Cir.1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has held that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986).

## STATEMENT OF FACTS

[Viewed most favorably to appellants.]

On May 24, 1977, Pako's Board of Directors adopted Plan No. 1, a nonfunded pension plan which included the following language:

8.3 *Acquisition of Employer.* Notwithstanding any future sale of a substantial amount of the shares of the Employer or the sale of substantially all the assets of the Employer or any merger or other reorganization, this plan shall continue to be binding upon the Employer, any successor in interest to the employer

---

1. The Honorable William C. Stuart, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

2. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

*and all persons in control of the Employer or any successor,* and no transaction or series of transactions shall have the effect of reducing or cancelling the accrued rights and benefits of present participants or the prospective rights and benefits of present participants under this plan unless consented to in writing by affected participants. (emphasis added)

In October, 1980 Pako entered into a Merger Agreement with Delblo Enterprises (Minnesota), Inc. (Delblo–Mn). As a result of the merger, Pako retained its name, but it was no longer a publicly held corporation. However, it is, in its new form, obligated to fulfill the contractual obligations of old Pako. Article V, paragraph 5.01 of the Merger Agreement. The Merger Agreement was executed on behalf of Delblo–Mn by defendant Gerard Blohorn as president. Andre Blohorn, Gerard Blohorn's father, through a wholly owned corporation (Delblo Enterprises, Inc.) and its wholly owned subsidiaries was the ultimate owner of Pako following the merger.

In December 1980, Blohorn and Kimberly became members of Pako's Board of Directors. Blohorn was elected chairman of the board and became chief executive officer when Robert L. Galloway, Pako's president left at the end of 1982. In December 1985 Thomas J. Nicoski was named president and chief executive officer of Pako and has continued to serve in that capacity. The day-to-day operating decisions are made by the president.

On June 3, 1981 Pako's Board of Directors, including Blohorn and Kimberly, voted unanimously in favor of the adoption of Plan 2, a deferred compensation plan. Plaintiffs, Rockney and Diers were entitled to benefits under Plan 2. This plan was also binding on "all persons in control of the Corporation or any successor thereto."

During the 1980 fiscal year, Pako sales totaled 87 million dollars and it employed 1723 persons. After the merger, more than 20 million dollars of Pako's assets were sold and the number of employees were reduced to 350. In early 1986 financial conditions worsened, salaries were cut or frozen and the company stopped paying bills on a regular basis. In March and April 1986 Pako notified plaintiffs that the payments called for under Plans 1 and 2 would be suspended. The decision was made by Pako's operating management. Blohorn and Kimberly were not informed of that decision until later on.

In March 1987 Pako filed for protection under Chapter 11 of Title II of the U.S. Bankruptcy Code. Under Pako Corporation's Fifth Plan of Reorganization, the claims of the plaintiffs under Plans 1 and 2 as nonpriority unsecured claims are to be paid in accordance with their terms. Plaintiffs have received, without interruption, monthly benefits under Pako's fully-funded qualified pension plan that is not involved in this lawsuit. This action was filed June 13, 1986.

### Oliver A. Kimberly, Jr.

There is no evidence in the record to support a finding that Kimberly was a "control person" either under the ERISA definition of employer or the language in the plans. Plaintiffs did not discuss Kimberly's role in Pako in the written briefs or oral argument. As there is no genuine issue of material fact on this critical issue, Kimberly is entitled to judgment as a matter of law. The trial court's order granting Kimberly's Motion for Summary Judgment and dismissing the action against him is affirmed.

The trial court's order granting Blohorn's Motion for Summary Judgment requires closer analysis.

### PERSONAL LIABILITY OF CORPORATE OFFICERS UNDER ERISA

Plans 1 and 2 are covered by ERISA 29 U.S.C. § 1003. However, as non-funded "Top Hat" plans "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," they need not conform to the requirements for participation, vesting, funding and fiduciary responsibility.

ERISA §§ 201(2), 301(a)(3) and 401(a), 29 U.S.C. §§ 1051(2), 1081 and 1101 (1985). An employer may be sued by participants in these plans to redress violations of ERISA or to enforce the terms of the plans. See 29 U.S.C. § 1132(a). Appellant-participants contend that the appellees come within the meaning of "employer" under ERISA and are thus individually liable to them for unpaid benefits.

ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of the employer, in relation to an employee benefit plan * * *." 29 U.S.C. § 1002(5).

"Person" means "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

We must first decide the standard upon which liability of corporate officers is to be based under ERISA. This is a case of first impression in the Eighth Circuit. However, the issue has been considered by other courts. Three lines of cases have developed.

The first line of cases is lead by *Solomon v. Klein,* 770 F.2d 352, 354 (3rd Cir. 1985). Chief Judge Aldisert stated the issue to be: "whether under concepts of statutory construction of ERISA we should conclude that Congress intended that corporate officers or large stockholders could be held liable for a corporation's violation of ERISA." The Third Circuit stated: "There is no indication that Congress intended to expose corporate officers to liability for their employers' violation of ERISA; in fact, the exclusion of corporate officers from the extensive enumeration of persons points in the opposite direction."

The Third Circuit held that corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil. The D.C. Circuit has recently taken the same position in *International Brotherhood of Painters and Allied Trades Union v. Kracher,* 856 F.2d 1546 (D.C.Cir.1988). Several other courts have reached the same conclusion.[3]

United States District Courts in Massachusetts and Illinois[4] have analogized ERISA to the Fair Labor Standards Act (FLSA) because of the similarity in the definitions of "employer" and reasoned that "Congress may properly be presumed to have recognized that courts were likely to interpret the ERISA definition of 'employer' as expansively as they had interpreted the nearly identical language of FLSA". *Trustees of Amalgamated Insurance Fund v. Danin,* 648 F.Supp. 1142, 1146 (D.Mass.1986); 8 FCB 1588, 1590. These cases held that corporate officers or stockholders could be personally liable under ERISA even though it would be inappropriate to pierce the corporate veil.

In *Laborers Pension Fund v. Bakke Construction Company, Inc.,* (N.D.Ill. Nov. 10, 1987) (not reported in F.Supp.) 1987 WL 19818, Chief Judge Grady, took a third "plain language" approach, saying:

We are asked to select between two recognized methods of statutory construction—plaintiffs' invitation to reason by analogy, or defendant's argument that expressio unius est exclusio alterius —both of which seek to effectuate congressional intent. We prefer a third method, however, which is most likely to effectuate congressional intent. Without the analogy to the FLSA, we find that the plain language of ERISA compels the conclusion that a controlling figure in the

**3.** *Operating Engineers Pension Trust v. Reed,* 726 F.2d 513, 515 (9th Cir.1984); *Solomon v. R.E.K. Dress,* 670 F.Supp. 96 (S.D.N.Y.1987); *Amalgamated Cotton Garment & Allied Industries Fund v. J.B.C. Company of Madera, Inc.,* 608 F.Supp. 158, 167 (W.D.Pa.1984) and *Combs v. Indyk,* 554 F.Supp. 573 (W.D.Pa.1982).

**4.** *Gambino v. Index Sales Corp.,* 673 F.Supp. 1450, 1456 (N.D.Ill.1987); *Trustees of Amalgamated Ins. Fund v. Danin,* 648 F.Supp. 1142,

1147 (D.Mass.1986); *Upholsterer's International Union Health and Welfare Fund Trustees v. Pontiac Furniture Inc.,* 647 F.Supp. 1053 (C.D.Ill. 1986); *Rubenstein v. Tri–State Transport, Inc.,* 646 F.Supp. 1 (D.Mass.1984); *Massachusetts State Carpenter's Pension Fund v. Atlantic Diving Company,* 635 F.Supp. 9 (D.Mass.1984); and *Alman v. Servall Mfg. Co.* (D.Mass.1984) 6 E.C.B. 2031, 2032.

corporation can be personally liable in circumstances which would not rise to the level required for piercing the corporate veil. ERISA's definition of a "person" includes an "individual," and its definition of "employer" refers to "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan" 29 U.S.C. § 1002(5). Despite the urging of the defendant, and fully mindful of the contrary view of the Third Circuit, we conclude that corporate officers and directors can be liable under ERISA for delinquent corporate contributions.

The plain import of ERISA is that officers and directors who are individuals acting directly or indirectly in the interest of a corporate employer can be personally liable for underpayments in relation to an employee benefit plan.

Judge Renner, in deciding the instant case, adopted as his own the following quote from *Gambino v. Index Sales Corp.*, 673 F.Supp. 1450, 1455 (N.D.Ill.1987):

[2] This Court is of course aware of the basic insulation from personal liability normally afforded individuals when they do business in corporate form.

But the uniform judicial reading of the FLSA definition of "employer" (a definition, it will be remembered, whose "acting directly ... or indirectly in the interest of an employer" language is repeated in ERISA) has been that such a broad-sweep definition was intended to strip away that insulation where the corporation-controlling individual has opted to prefer the payment of other corporate debts to the payment of obligations running to corporate employees and given special statutory recognition by Congress. Courts have implemented that intention under FLSA, and they should do no less under ERISA's substantively identical provisions.

However, Judge Renner restricted personal liability considerably, holding that: "an individual officer, director or shareholder is not an ERISA employer for purposes of Title I liability solely by virtue of

his or her corporate title or ownership interest. However, ERISA's definition of employer is certainly broad enough to include an individual officer, director or shareholder exercising sole or principle control over a corporate employer. It *is said individual's operational control over the corporation's decision to continue operations but refuse to pay out the required contributions, that justifies imposition of liability*." (Emphasis supplied.)

The only circuit courts to address the issue directly are the Third and D.C. Circuits. As pointed out earlier, they refused to impose personal liability on a corporate officer unless the evidence would support the piercing of the corporate veil. The Ninth Circuit, while not specifically addressing ERISA, has applied the same rule in a similar case. *Operating Engineers Pension Trust v. Reed*, 726 F.2d 513, 515 (9th Cir.1984). The First Circuit, in deciding that the company president and sole shareholder was not an employer *obligated to make contributions* to an employee welfare plan under 29 U.S.C. § 1145, indicated it would likely accept the interpretation of its district courts and interpret the ERISA employer definition as interpreted in FLSA cases. *Massachusetts Laborers Health and Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 24 (1st Cir.1988).[5]

█ We believe that the Massachusetts and Illinois district courts and Judge Renner in this case, have incorrectly interpreted congressional intent in holding that corporate officers, under some circumstances, can be personally liable under ERISA when the common law would not pierce the corporate veil.

It should not lightly be inferred that Congress intended to disregard the shield from personal liability which is one of the major purposes of doing business in a corporate form. *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir.1983). There is no indication in the legislative history that Congress intended to expose corporate officers to liability for the corporation's violation of ERISA. The exclusion of "corporate offi-

**5.** The defendants have not argued that § 1145 applies to the facts of this case.

cers" from the extensive enumerations of those included in the definition of persons points in the opposite direction. *Solomon v. Klein,* 770 F.2d at 354.[6] "Limited liability is the hallmark of corporate law. Surely if Congress had decided to alter such a universal and time-honored concept, it would have signaled that resolve somehow in legislative history." *International Brotherhood of Painters and Allied Trades Union v. Kracher,* 856 F.2d 1546 (D.C.Cir.1988).

The *Kracher* court then quoted the following from *Connors v. P & M Coal Co.,* 801 F.2d 1373, 1376 (D.C.Cir.1986):

> We find nothing in either the language or purpose of MPPAA to justify so significant a compromise of the corporate principle of limited liability, nothing to suggest that Congress intended to subject owner-operators of a closely held corporation to personal liability merely because they actively participated in running the business. Acceptance of the district court's "interest and control" test would not only subvert the major purpose of incorporation, but would discourage future participation in multiemployer pension plans—a result that is clearly contrary to one of MPPAA's stated objectives.

■ Again quoting from *Kracher* at 1548:

> It cannot be said that a corporate official is a "person acting directly as an employer." It is hornbook law that a corporate employee functioning purely as such acts not *as* but solely *for* the corporate employer; the corporation acts as the employer it is, though it can do so only through the agency of the employee or someone else. Moreover, we think it would be foolhardy to consider Kracher as one who "act[ed] indirectly in the interest of an employer." Such an expansive heading would mean that every employee or other agent who discharges some responsibility in regard to a corporation's employee benefit plan would be

swept within the definition and thereby become an "employer" subject to liability for delinquent contributions. Obviously Congress did not contemplate that.

There were no statutory remedies for delinquencies in contributions to a plan until the passage of the Multiemployer Pension Plan Amendment Act of 1980 (MPPAA). Therefore, "[i]t is impossible to read into a definition of 'employer' adopted in 1974 any congressional purpose to specify essential elements of a statutory right of action for recovery of unpaid contributions that did not exist until 1980." *Kracher* at 1548.

There is also a significant difference between the operation of ERISA and FLSA, respectively. ERISA does not require employers to provide pension plans; the obligation to do so, and to contribute to them, springs from a privately-made contract embodied in a plan or a collective bargaining agreement. FLSA, however, commands employers to pay specified wages. This fundamental deviation, together with the complete absence of evidence that Congress had in mind the interpretation urged upon us by the Fund, constrains us to reject the notion that FLSA caselaw should be assigned a role in the context of Title I of ERISA. *Kracher, id.*

We adopt the foregoing quotes from *Kracher* as our own. To summarize, we believe that, in the absence of any expression of clear congressional intent to abrogate the long established corporate principle of limited liability, the courts should be reluctant to find that Congress intended to do so. The similarity in definition of employer under FLSA and ERISA is not enough to attribute that intent to Congress because of the differences in operation of the two acts. The imposition of personal liability upon controlling persons of closely held corporations for contributions to pension plans would have far reaching consequences. The prospect that such person's individual assets could be taken to satisfy

---

**6.** The enumeration of those considered persons under ERISA is much more extensive than the enumeration contained in the FLSA definition which the court in *Gambino,* 673 F.Supp. at 1456, considered identical because both omitted "corporate officers."

corporate obligations in the event the corporation became unable to make the payments, would discourage such corporations from establishing or continuing pension plans for its employees. Rather than protecting an employees rights under a pension plan, that rule would tend to deprive the employees of any pension plan. Congress certainly did not intend that result. We hold that corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil. Therefore, we do not need to decide whether Blohorn's activities would have subjected him to personal liability under the Massachusetts–Illinois authorities.

### ERISA PREEMPTION OF CONTRACT DEFENSES

Although we have held that Congress did not intend corporate officers to be personally liable under ERISA's definitions of "employer" and "person", such officers could be personally liable under ERISA if the terms of the plan imposed such liability on them. Plaintiffs claim the plans in issue here imposed such liability.

Judge Renner held that "plain and ordinary meaning of the disputed paragraphs leaves no question but that the parties intended individuals in control to be jointly and severally liable, along with the corporation, for pension plan contributions." However, as there was no evidence of any written or oral agreements between the plaintiffs and Blohorn, he applied certain contract defenses to hold that there was no basis to impose personal liability on him. As we agree that there is no basis for the imposition of personal liability, we can accept his interpretation of the disputed paragraphs.

Judge Renner applied basic contract principles which dictate that "employee benefit plans do not bind individual third parties who were not signatories to the agreements or who have not expressly accepted liability through some other form of endorsement, guarantee or express undertak-

ing." He held there was no evidence that the defendants accepted personal liability for these corporate contractual obligations. We agree that such evidence has not been produced.[7]

In their written brief the plaintiff appellants did not directly attack this defense, but argued that:

The several contract defenses advanced by Blohorn and Kimberly should be rejected because 29 U.S.C. § 1444(a) and (c)(1) of ERISA supercede any and all state laws including statutes, case law and common law insofar as they relate to any pension plans such as Plan 1 and Plan 2. As such, ERISA preempts reliance upon contract defenses.

Section 514 of ERISA, 29 U.S.C. § 1144, provides:

That the act shall supersede any and all state laws that pertain to any employee benefit plan. The language in § 1144 is broad, indicating Congress' intent to preempt the entire field of law involving employee benefit plans subject to ERISA. Section 514(c)(1) of ERISA, 19 U.S.C. § 1144(c)(1), defines state law to include all laws, decisions, rules, regulations or other state action having the effect of law in any state. Thus, not only statutory law is preempted, but also case law which is contrary to any provision of ERISA.

*Helms v. Monsanto Co., Inc.*, 728 F.2d 1416, 1419–1420 (11th Cir.1984).

■ Although ERISA has preempted state contract actions as such, a claim that the terms of a pension plan covered by ERISA make corporate officers personally liable is in the nature of a contract action. Since ERISA does not contain a body of contract law to govern the interpretation and enforcement of employer benefit plans, appropriate state contract law should apply here, *Scott v. Gulf Oil Corporation*, 754 F.2d 1499, 1501–1502 (9th Cir.1985), unless the application of state law in this case would be contrary to the provisions of

---

7. The parties have treated this issue as an affirmative defense, but it would seem more appropriate to view it as a failure of the plaintiffs to establish an essential element of their claim. In any event, the lack of such evidence would bar recovery under contract law.

ERISA. *Helms v. Monsanto, Inc.*, 728 F.2d 1416, 1420 (11th Cir.1984).

No cases have been cited relating to the effect of ERISA's preemption of state contract actions on basic contract principles that personal liability can only be imposed on the parties to the agreement and those who have in some manner accepted the agreement and agreed to be bound thereby. As we have already held that Congress in ERISA did not intend to impose liability on corporate officers unless there is a basis to pierce the corporate veil, the application of this principle would not be contrary to the provisions of ERISA.

The Supreme Court has previously endorsed the use of a traditional contract defense in an ERISA action. In *Kaiser Steel Corporation v. Mullins*, 455 U.S. 72, 86–88, 102 S.Ct. 851, 861–862, 70 L.Ed.2d 833 (1982), the Supreme Court considered the applicability of the defense of illegality in actions for delinquent contributions brought by pension fund trustees under 29 U.S.C. § 1145, which provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*Kaiser* contended that the collective bargaining agreement required contributions that were in violation of the Sherman Act and the National Labor Relations Act. The Supreme Court stated that an employers obligation to contribute to an employee benefit plan could not be determined without regard to other laws and permitted the employer to raise the illegality defense. In discussing the availability of such defense under § 1145, Justice White, speaking for the majority stated:

> Far from abolishing illegality defenses, § 1145 explicitly requires employers to contribute to pension funds only where

doing so would not be "inconsistent with law." ... The legislators did not say that employers should be prevented from raising all defenses' rather they spoke in terms of "unrelated" and "extraneous" defenses. As the United States points out in its brief, none of the cases the legislators endorsed "involved the enforcement of a contribution clause that itself was alleged to violate the law."

*Kaiser* at 86–87.

■ Although the defense in this case is not based on the violation of a federal statute, requiring these defendants to make payments would be contrary to well established contract law principles. The very promise that plaintiffs seek to enforce would, under contract law, be subject to a claim that the defendants never accepted personal liability. The defense that the person was not a party to or by his actions bound by the terms of a contract is a valid defense to an action under ERISA for contributions from that person based on that contract.

As an alternative basis for summary judgment, Judge Renner held that plaintiffs cause of action was barred by the Minnesota Statute of Frauds. Minn.Stat. § 513.01. In view of our foregoing decisions, we need not reach the issues involved with the application of the statute of frauds.

The trial court properly sustained the defendants' motions for summary judgment. The judgment entered for the defendants is affirmed.

HEANEY, Senior Circuit Judge, dissenting.

The critical question in this case is whether Gerard Blohorn was in effective control of Pako at the time Pako's assets were dissipated. If he was, then clearly under the terms of the pension agreements he is personally liable for the plaintiffs' pension benefits.[1] In my view, he was in

---

1. I also agree with the district court that under ERISA an individual may be liable for employee pensions where he exercises substantial control over the running of the corporation. The ma-

jority's more restrictive interpretation of ERISA does not accord with that statute's purposes, *Gambino v. Index Sales Corp.*, 673 F.Supp. 1450, 1454–56 (N.D.Ill.1987) (Shadur, J.), and makes

effective control of Pako at that time and at the time that the plaintiffs' pension benefits were discontinued. Since this appeal comes from a grant of summary judgment for Gerard Blohorn, we need not go that far. All we need to find is that there is a material factual dispute over Gerard Blohorn's role, and there clearly is. I would reverse and remand for trial.[2]

## BACKGROUND

The following facts are undisputed. In 1980, a French family through various shell corporations purchased a Minnesota company, Pako. Andre Blohorn was the equitable owner of the shell corporations. As the sole stockholder, he became personally liable for the pension obligations. He has since died. Pako's pension obligations were also assumed by its successor corporation through a merger agreement negotiated and signed by Gerard Blohorn, Andre Blohorn's son. The family's business affairs with respect to Pako have always been conducted by Gerard Blohorn. Gerard Blohorn is also the president of all the shell companies, most of which have no employees. In essence, Andre Blohorn owned a variety of businesses, and Gerard managed them. Andre Blohorn's heirs, including Gerard, are currently involved in a probate dispute over the ownership, while Gerard continues to run the companies.

During the 1980 fiscal year, Pako had sales of $87 million and employed 1,723 people. Gerard Blohorn became the President, a director and Chief Executive Officer of Pako. He moved to Minnesota and presided over the dismantling of Pako, selling $20 million in corporate divisions and assets through October, 1985. In December, Blohorn moved back to France. A new president was named, and Blohorn's role in his selection is unclear. The new president suspended pension payments to the plaintiffs in early 1986, and subsequently placed the remaining operation in bankruptcy.

The plaintiffs are former management employees who spent most of their working lives with Pako. Their pensions were fixed by two agreements, one made before and one made after the merger. The agreements, the district court correctly found, "leave[ ] no question but that *the parties intended individuals in control to be jointly and severally liable,* along with the corporation, for the pension plan contributions." Memorandum Opinion at 17 (emphasis added). The four plaintiffs are entitled to receive a total of approximately $70,000 per year. Gerard Blohorn continued to receive $250,000 a year in salary from Pako alone through 1986, in addition to a generous expense account, and is using a $225,000 defense fund set aside by Pako for this litigation.

## DISCUSSION

The pension agreements were formally made between Pako and the plaintiffs. Usually, a contract cannot bind someone who is not a party to it. A third party can become liable, however, by adoption, guarantee or through an express undertaking. In this case, the evidence viewed most favorably to the plaintiffs shows that Gerard Blohorn became personally bound.

Gerard Blohorn was at various times the Chairman of the Board and the Chief Executive Officer of Pako. He has always been a director. He is also the President of all the shell corporations which in turn own Pako and run the family's business affairs, Delbo Enterprises (Minnesota) Inc., Delbo Enterprises (Delaware) Inc., Delbo Netherlands B.V., and Delbo Netherlands N.V. Gerard Blohorn made all the important de-

---

it easier for ongoing businesses to be looted. Given the majority's concern that corporate directors would be hesitant to approve pension plans were individual liability the rule, perhaps the scope of individual liability for controlling persons under ERISA should be limited to those occasions where deliberate acts are taken to avoid pension responsibilities or where a viable business is broken up for economic gain. Sure-

ly, the intentional evasion of responsibility for employee pensions violates ERISA; otherwise, it becomes a social cost for which we all must pay.

**2.** I agree that summary judgment was appropriate in favor of Kimberly.

cisions regarding Pako's operation and dismantling. He negotiated Delbo's acquisition of Pako which specifically provided for the assumption of the pension plan and individual liability. As a director, Gerard Blohorn voted for the second pension plan which made the controlling figures in Pako individually liable.

It is clear throughout the relevant time period that Gerard Blohorn has been in effective control of all the shell corporations and their subsidiaries, including Pako. In light of this evidence, it is apparent that a jury could reasonably find that Gerard Blohorn was in effective control and should be held liable. The district court concluded, however, that he cannot possibly be liable because he was not consulted about the suspension decision until after it was made. This is not a decisive fact for two reasons. First, the President might have had no alternative in light of Gerard Blohorn's decision to sell off almost all of Pako's assets. Second, and crucially in my view, Gerard Blohorn admits that he was told of the decision to suspend pension payments soon after it was made, and admits that he had the power to reverse that decision. Deposition of Gerard Blohorn at 49 (April 9, 1987); Joint Appendix at 218.

Thus, in light of the language of the pension plans, the district court erred by requiring that Blohorn have made the initial suspension decision personally. Even if Blohorn is believed, he was aware of the suspension and by his own admission held the ultimate power to let it continue or to resume payments. This is sufficient under the language of the pension plans and

merger agreement to trigger individual liability, for each agreement binds "all persons in control of the corporation * * *." Majority Op. at 639.

The majority adopts the district court's reasoning that Blohorn also cannot be liable because in ratifying the pension agreements he was acting in an official capacity on behalf of Pako. *Id.* at 643, 644. He was thus giving Pako's promise of his personal liability rather than his own. This argument is unconvincing. While the corporate shell might often protect a controlling person who gives the corporation's promise, it does not protect a controlling person who makes what is expressly an individual promise. When Gerard Blohorn voted to approve the pension plan at the directors meeting with its unique individual liability provisions, he was giving his own assent, as well as that of Pako.[3]

CONCLUSION

The plaintiffs have put forth sufficient evidence to allow the jury to decide whether Gerard Blohorn controlled Pako. I dissent and would reverse the grant of summary judgment.

---

**3.** As an alternative, the district court believed that Gerard Blohorn would not be bound because he did not sign any writing as required by the statute of frauds. Minn.Stat. § 513.01(1) (agreements not performed within one year). I

disagree because part performance is sufficient to remove the claim from the statute of frauds. *Hartung v. Billmeier,* 243 Minn. 148, 66 N.W.2d 784 (1954).