**PIPE FITTERS HEALTH AND WEL-FARE TRUST, Pipe Fitters Pension Trust, Pipe Fitters Local Union No. 562, John Marshall, Administrator and Fiduciary of all plaintiff funds, Lester Gross, Joe Barry, Don Devitt, Robert McDonald, Trustees, Plaintiffs/Appellants,**

**v.**

**WALDO, R., INC., R. Waldo, Inc., Defendants**

**Russell Waldo, Defendant/Appellee.**

**No. 91–3063.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1992.

Decided July 16, 1992.

Brent Jaimes, St. Louis, Mo., argued (John Goffstein, on the brief), for plaintiffs/appellants.

John Ellinger, Jefferson City, Mo., argued, for defendant/appellee.

Before FAGG and BEAM, Circuit Judges, and BATTEY,* District Judge.

BEAM, Circuit Judge.

Pipe Fitters Health and Welfare Trust, Pipe Fitters Pension Trust, Pipe Fitters Local Union No. 562, and various fund administrators and trustees (collectively "Pipefitters") appeal from the district court's decision refusing to pierce the corporate veil of R. Waldo, Inc. and Waldo, R., Inc. and hold Russell Waldo personally liable for lost wages, pension payments, health and welfare payments, initiation fees, and union dues under the Employee Retirement Security Act of 1974 ("ERISA") and the Labor Management Relations Act. We affirm.

## I. BACKGROUND

Pipefitters brought this action in 1984 against Russell Waldo, individually, and R. Waldo, Inc., and Waldo, R., Inc., two companies owned by Russell Waldo. Both companies operated as contractors for plumbing, heating, air conditioning, and other related work. R. Waldo was the first company formed. "[F]or several years [R. Waldo had] negotiated collective bargaining agreements with the Congress of Independent Unions (CIU) covering all of the company's employees." *Pipe Fitters Health & Welfare Trust v. Waldo, R., Inc.,* 872 F.2d 815, 816 (8th Cir.), *cert. denied,* 493 U.S. 977, 110 S.Ct. 504, 107 L.Ed.2d 506 (1989). In 1982, however, a representative of Pipe Fitters Local Union No. 562 ("Local 562"), a rival of CIU, contacted some R. Waldo employees and discussed the possibility of the employees becoming members of Local 562. (Local 562's wage rate was considerably higher than CIU's.) Later, another Local 562 representative, James O'Mara, contacted Russell Waldo. After negotiation, Russell Waldo agreed to form a separate corporation, Waldo, R., "for the purpose of signing a collective bargaining agreement with Local 562." *Pipe Fitters v. Waldo, R.,* No. 84–2163 C (2), Memorandum at 2 (E.D.Mo. July 14, 1987).

Waldo, R. having been formed and a bargaining agreement signed, Russell Waldo "then transferred eight of his employees to Waldo, R. [and] promised O'Mara and the remaining employees [at R. Waldo] that he would phase out R. Waldo operations as the work bid by that company was completed, and its employees could join [Local 562] when [R. Waldo's] CIU agreement expired." *Pipe Fitters,* 872 F.2d at 816. "[Russell] Waldo, however, did not run the two construction companies as he had promised. Waldo, R. never bid on any projects and never had any work other than what it subcontracted from R. Waldo." *Id.* In 1983, Local 562 renewed its contract with Waldo, R. This renewed contract "contained provisions for direct payment to the union of initiation fees, dues and assessments, and for contributions to an employee health and welfare trust fund and pension fund." *Id.* at 816–17. Then, in 1984, Russell Waldo renewed R. Waldo's CIU contract "[e]ven though the R. Waldo employees unanimously voted against CIU representation." *Id.* at 817. "This contract was never ratified by R. Waldo employees" and, after Local 562 brought a charge of unfair labor practices, "[t]he NLRB found that [Russell] Waldo had engaged in unfair labor practices by renewing the CIU contract after the CIU ha[d] lost its majority support, by unlawfully coercing and discriminating against employees and by giving unlawful support to the CIU." *Id.*

"Meanwhile, Pipefitters brought this action in federal district court in an attempt to hold Waldo, R., R. Waldo, and Russell Waldo, individually, liable for violations of the [Local 562] contract." *Id.* Pipefitters alleged a loss of $90,000 in union wages as a result of Waldo, R. diverting its work to the R. Waldo employees. Pipefitters also alleged that the work diversion resulted in a loss of pension payments, health and welfare payments, initiation fees, and un-

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

ion dues, totalling approximately $80,000. *Id.* The district court, however, refused to enforce Local 562's contract, holding that Russell "Waldo was running a double-breasted operation and that Waldo, R. was the alter ego of R. Waldo." The district court also held that Local 562's "contract was illegal as one employer may not negotiate a collective bargaining agreement with another union when his employees are already represented by a union." *Id.*

On appeal, we reversed the decision of the district court, holding that it was "directly contrary to the findings of the [NLRB]" and "that the existence of the CIU contract did not preclude [Russell] Waldo from operating a split shop and from entering into a prehire agreement with [Local 562] covering the construction workers employed by Waldo, R." *Id.* We did not, however, decide the issue of whether Russell Waldo could be held personally liable for the contractual obligations of R. Waldo and Waldo, R. *Id.* at 820. We remanded this case to the district court to determine whether any money was owed to Pipefitters and, if so, to resolve the issue of Russell Waldo's individual liability.

In May 1991, the district court issued a memorandum opinion deciding that R. Waldo and Waldo, R. are liable to Pipefitters in the total amount of $741,189 and that Russell Waldo could not be held personally liable for the debts of his corporations. The district court, citing *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1110–11 (9th Cir.1979), looked to three factors in its analysis of Russell Waldo's personal liability: (1) the degree of respect that the shareholder gave to the separate identity of the corporation; (2) the incorporator's fraudulent intent, if any; and (3) the degree of injustice that the plaintiffs would suffer if the corporate entity was recognized. *See Pipe Fitters v. Waldo, R.,* No. 84–2163 C (2), Memorandum Opinion at 7 (E.D.Mo. May 10, 1991).

The district court concluded, with respect to the first factor, that although Waldo, R. was the alter ego of R. Waldo, Russell Waldo had shown a proper degree of respect for corporate formalities. R. Waldo, for example, had "maintained separate corporate records, the board of directors met annually, and, on occasion, the board of directors held special meetings to authorize the president of the company, Russell Waldo, to proceed on a particular matter." *Id.* at 8. Although Pipefitters "tried to establish that Waldo commingled his personal funds with those of the corporations and that he treated corporate assets as his own," the district court concluded that Pipefitters "failed in their proof." *Id.*

In its consideration of the second factor, the district court concluded that there was no evidence of bad faith or fraudulent intent by Russell Waldo in forming the corporations: "R. Waldo was an ongoing business which appears to have been adequately capitalized at the outset. Waldo[,] R. was created in good faith for the purpose of bidding on projects which required an AFL–CIO union work force." *Id.* at 9. Finally, applying the third factor, the district court acknowledged that Pipefitters "might have trouble collecting the judgment" against Waldo, R. and R. Waldo (both of which have since gone out of business), but concluded that "that alone does not constitute an inequitable result." *Id.* at 10.

On appeal, Pipefitters argues that because Congress intended ERISA to be construed liberally to protect workers, Russell Waldo should be personally liable for his corporation's failure to make ERISA contributions, despite the protection of the corporate entity. Pipefitters also argues that, if Russell Waldo can only be held liable by piercing the corporate veil, the standard for determining when to disregard the veil of incorporation should be less onerous when the action is for failure to make ERISA contributions. Finally, Pipefitters claims that the district court's decision that Russell Waldo is not liable for wages and fringe benefits is clearly erroneous.

## II. DISCUSSION

■ Our resolution of the issues raised by Pipefitters requires far less space than our summary of the background leading up to this appeal. Pipefitters's general argument that corporate officers like Russell Waldo should be personally liable under ERISA was decided by this court in *Rockney v. Blohorn*, 877 F.2d 637 (8th Cir.

1989). In *Rockney;* we held that "corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil." *Id.* at 643. We have no authority to overrule *Rockney.* Moreover, Pipefitters's simple assertion that the legislative history of ERISA generally supports a liberal construction of the Act is no argument when considered under our thorough analysis in *Rockney. See id.* at 639–43.

Likewise, we do not agree with Pipefitters that a less onerous standard for piercing the corporate veil should be applied. Pipefitters, again, argues that the general legislative intent to construe ERISA liberally supports this notion, and that a less onerous standard is particularly appropriate in a case, such as this, where the sole shareholder and corporate officer exercises substantial control over the business. As we explained in *Rockney*, if Congress intended to expose corporate officers to personal liability for violations of ERISA beyond the usual limits, " 'it would have signaled that resolve somehow in legislative history.' " *Id.* at 642 (quoting *International Brotherhood of Painters and Allied Trades Union v. Kracher*, 856 F.2d 1546, 1548 (D.C.Cir.1988)). In passing ERISA, Congress gave no indication—in either the statutory language or legislative history—that it "intend[ed] to abrogate the long[-]established corporate principle of limited liability," and we will not treat ERISA as if it had. *Id.*

Finally, we disagree with Pipefitters that the district court's decision to not pierce the corporate veil of R. Waldo and Waldo, R. is clearly erroneous. Pipefitters argues a number of points in its brief, but none of these arguments—most of which were addressed by the district court in its memorandum opinion—convince us that the district court abused its discretion.[1] Pipefitters's primary point of contention seems to be that R. Waldo sold land valued at $95,708 to Russell Waldo in 1983 in exchange for 71 shares of R. Waldo stock. Because Russell Waldo later sold the same land (in 1986) for $550,000, Pipefitters argues this is evidence that Russell Waldo had no respect for the separate identity of the corporate entity and that he operated the corporation fraudulently and with bad faith. We disagree. The land transaction was approved by R. Waldo's board of directors and, as the district court explained, "[t]he land transaction in question not only occurred before this suit was filed, it also occurred before a formal complaint was issued against 'Waldo Construction' by the National Labor Relations Board." Memorandum Opinion at 9.

## III. CONCLUSION

For the reasons stated above, the decision of the district court is affirmed.

---

1. In addition to the factual points, Pipefitters argues that the district court erred in relying on the test in *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1110–11 (9th Cir.1979), for piercing the corporate veil, rather than the test under Missouri law. *See, e.g., Fairbanks v.* *Chambers*, 665 S.W.2d 33, 36–37 (Mo.App.1984). We agree, however, with the district court's conclusion that "the result under Missouri law would be the same." Memorandum Opinion at 7 n. 6.