# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3154

_____

Teamsters Local Union 682,                    *
                                              *
            Appellant,                        *
                                              *   Appeal from the United States
      v.                                      *   District Court for the
                                              *   Eastern District of Missouri.
KCI Construction Company, Inc.,               *
                                              *
            Appellee.                         *

_____

Submitted:  April 15, 2004
    Filed:  September 15, 2004

_____

Before WOLLMAN, McMILLIAN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

      Teamsters Local Union 682 (Local 682) appeals from the district court's decision to confirm arbitration awards in favor of KCI Construction Company, Inc. (KCI). Contending the arbitration awards enforced an unlawful hot cargo agreement, see 29 U.S.C. § 158(e) (prohibiting agreements requiring employers to cease doing business with other employers), Local 682 argues the district court's entry of summary judgment in KCI's favor must be reversed. Because we conclude confirmation of the arbitration awards may enforce an unlawful hot cargo agreement, we remand to the district court for further proceedings consistent with this opinion.

## I.    BACKGROUND

BJC Health Systems, Inc. hired KCI as a general contractor to build Phase I of a Campus Integration Project (Project), which entailed building the north campus parking garage.  KCI, the St. Louis Building and Construction Trades Council, and all AFL-CIO Building Trades Affiliates signed a Project Agreement.  Local 682 signed the Project Agreement as well.  The Project Agreement included the following clause in section 3.03:

> The Collective Bargaining Agreement ("CBA") in effect between the Unions executing this Agreement and the Employer or its Subcontractors executing this Agreement are applicable to the work, except as such CBA may be modified by the provisions of this Agreement. . . . **The Employer and its Subcontractors acknowledge that in performing work, including local fabrication of custom millwork and casework, and local on-site deliveries of construction material and equipment, they will utilize employees who are represented by Unions affiliated with the AFL-CIO Building Trades.**

(emphasis added).  The Project Agreement also contained section 4.04 to prevent work stoppage:

> **The Unions and employees will not strike, nor engage in any picketing, sitdowns, slowdowns, sympathy strikes, or other refusals to work**; nor will Employer or its Subcontractors lock out the employees during the performance of the Project.  This No Strike Pledge includes jurisdictional disputes and contract expirations.  The Unions will not recognize any picket lines for or as a result of a Jurisdictional Dispute, Sympathy Strike, Contract Expiration or informational picket.

(emphasis added).  The Project Agreement also contained numerous other clauses (sections 1.01, 1.02, 4.06, 4.12) to make clear the parties intended to avoid work

stoppages. Finally, the Project Agreement included an arbitration clause (section 4.06).

KCI contracted with Material Service Company (MSC) to provide concrete for the Project, because MSC was able to supply the special concrete needed for the sophisticated Project. MSC employed Local 682 members to deliver the concrete to the Project site, and no Local 682 members actually worked on the site other than to deliver construction material to the site. As far as this court can determine, MSC never signed the Project Agreement. However, MSC did enter into a collective bargaining agreement with Local 682.

When the collective bargaining agreement between MSC and Local 682 expired during the term of the Project, Local 682 struck MSC for approximately eight weeks in the summer of 2000. During the strike, Local 682's members refused to deliver concrete for MSC to the Project site. Because KCI was unable to get Local 682 members to deliver the concrete for MSC, MSC's management employees delivered the concrete. In response, Local 682 demanded KCI cease and desist from using non-union members to deliver concrete to the Project site, concluding "[KCI] violated Section 3.03 and all other sections [of the Project Agreement] that may refer to union employees by accepting the delivery of concrete in trucks driven by persons other than employees who are represented by Unions affiliated with the AFL-CIO Building Trades."

KCI filed a grievance against Local 682 for breaching the Project Agreement's no-strike clause, i.e., section 4.04, by not delivering the concrete for MSC to the Project site. The grievance proceeded to a two-phase arbitration, with the first phase addressing liability and the second phase addressing damages. During the liability phase, KCI contended Local 682 breached the no-strike clause by refusing to deliver concrete to the Project site. Local 682 contended the Project Agreement did not apply to MSC because MSC was a non-signatory supplier and the Project Agreement only

applied to KCI and its subcontractors. KCI presented evidence at the hearing; Local 682 did not.

In its opening statement to the arbitrator, KCI discussed the interaction between sections 3.03 and 4.04 of the Project Agreement. KCI recognized it "ultimately agreed to the union's request that Teamster Local 682 would make all deliveries of construction materials and equipment to the job site." KCI also made the following point: "In addition to [sections] 3.03 and 4.04, the language of the entire agreement is controlling with regard to one simple fact, and that fact is . . . the union got all the work, and the only thing [KCI] got out of this whole particular thing is that the project would have no interruptions." Rick Grebel (Grebel), KCI's president, testified at the hearing that the Project Agreement's sole purpose "obviously is to have no work stoppages. In exchange for no work stoppages, basically the job is done a hundred percent union." When asked what "two essential provisions" of the Project Agreement KCI contended Local 682 violated, Grebel explicitly referenced sections 3.03 and 4.04.

The arbitrator sustained KCI's grievance against Local 682 for violating its no-strike pledge. Before enforcing the no-strike clause, the arbitrator concluded MSC was a subcontractor as that term is used in the Project Agreement, such that the Project Agreement covers MSC and its on-site deliveries of construction material. The arbitrator then used section 3.03 to conclude Local 682 violated its no-strike pledge contained in section 4.04:

> So far as appears, [Local 682] has steadfastly asserted the exclusive right to deliver all incoming materials on the site, and it steadfastly made deliveries in advance of the strike. **For its part, [KCI] recognized [Local 682]'s exclusive delivery right as stemming directly from the same negotiations which produced [Local 682]'s "No Strike Pledge."** Having thus achieved the right to exclusive deliveries, and having accepted the benefits of such right in practice, [Local 682] cannot now

be heard to deny its obligation to make deliveries under the same Agreement.

(emphasis added). Based on these conclusions, the arbitrator, on January 5, 2001, issued an award on liability holding Local 682's refusal to deliver concrete to the Project site violated the Project Agreement's no-strike clause.

During the damages phase of the arbitration proceedings, the arbitrator awarded $112,721.15 to KCI based on Local 682's breach of the Project Agreement. In its damages award, the arbitrator confirmed his liability finding by reiterating his conclusion "that a supplier of materials [i.e., MSC] *can* reasonably be viewed as a subcontractor under relevant case authorities, under the language of the Agreement (Article 3.03) and by virtue of the parties' performance of the Agreement in day-to-day practice." During the arbitration proceedings, Local 682 never argued or intimated that section 3.03 was an unlawful hot cargo agreement.

Local 682 then filed suit in federal court on July 9, 2002, seeking to vacate the arbitrator's liability and damages awards in KCI's favor. Local 682 contended the arbitration awards failed to draw their essence from the Project Agreement. KCI counterclaimed, seeking to confirm and enforce the arbitration awards. Over six months after filing its federal suit, and more than two years after the arbitrator's liability award, Local 682 amended its complaint on January 16, 2003, to add a hot cargo defense, contending for the first time that section 3.03 of the Project Agreement is a hot cargo agreement that violates public policy. Local 682 later filed a motion for summary judgment, and KCI filed a cross-motion for summary judgment.

Concluding the arbitration awards did not violate public policy and drew their essence from the Project Agreement, the district court granted KCI's motion for summary judgment, and entered an order confirming the arbitration awards. The district court concluded Local 682's hot cargo defense failed for three reasons. First,

-5-

the district court determined Local 682's "sandbagging tactics" of failing to raise the issue to KCI or before the arbitrator were improper: "[Local 682] invoked Section 3.03 for its benefit and should not be heard to complain about its enforceability for the first time here in an effort to avoid payment of damages." The district court specifically held "Local 682 cannot withhold factual and legal arguments during arbitration and then raise them for the first time during enforcement proceedings in federal court." Second, the district court concluded the arbitration awards do not enforce section 3.03, because the awards do "not require KCI to utilize union employees for local on-site deliveries of construction material and equipment to the exclusion of non-union drivers." Instead, the court determined the arbitrator simply found "Local 682 liable for damages caused by [Local 682]'s failure to deliver concrete as required under the Project Agreement." Finally, the district court reasoned "Local 682 has failed to show that Section 3.03 of the Project Agreement even violates Section 8(e)" of the National Labor Relations Act (NLRA). However, the district court stated that whether section 3.03 violates section 8(e) was not an issue it was "bound to decide."

Local 682 appeals the district court's summary judgment in KCI's favor. Local 682 contends section 3.03 is an unlawful hot cargo agreement, and the district court erroneously enforced arbitration awards "based on or linked" to that agreement. Local 682 also argues the district court erroneously refused to adjudicate Local 682's hot cargo defense. KCI maintains the district court correctly confirmed the arbitration awards, which enforced section 4.04 only. KCI argues section 3.03 was not even implicated by the district court's judgment or the arbitration awards. KCI also contends the district court correctly rejected Local 682's invitation to engage in fact finding and contract interpretation, and instead relied appropriately on the arbitration record to confirm the arbitration awards.

## II.    DISCUSSION

In reviewing the district court's decision confirming the arbitration awards, "we accept the court's factual findings unless clearly erroneous, but decide questions of law de novo." Schoch v. InfoUSA, Inc., 341 F.3d 785, 788 (8th Cir. 2003). The underlying arbitration awards are generally given "an extraordinary level of deference." Id. (citation omitted). Notwithstanding our obligation to show great deference to most arbitration awards, we must not enforce illegal contracts. See Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77 (1982). We have an absolute "duty to determine whether a contract violates federal law before enforcing it." Id. at 83. When a party such as Local 682 raises an illegality defense, "a court must reach the merits of [that] defense in order to determine whether the contract clause at issue has any legal effect in the first place." Id. at 84.

In this case, we ask whether the arbitration awards enforce an unlawful hot cargo agreement. To answer this question, we must determine whether the arbitration awards even enforce section 3.03, as opposed simply to enforcing section 4.04. Because Local 682 does not–and cannot–contend that the no-strike pledge contained in section 4.04 violates public policy by its own terms, Local 682 must show (1) the arbitration awards enforce section 3.03, and (2) section 3.03 is an unlawful hot cargo agreement.

Section 8(e) of the NLRA precludes an employer and union from entering into a hot cargo agreement, which requires the employer to cease doing business with another employer. 29 U.S.C. § 158(e). Specifically, section 8(e)'s hot cargo provision contains the following language: "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an

-7-

agreement shall be to such extent unenforceable and void." Id. The Supreme Court has mandated that "a court may not enforce a contract provision which violates § 8(e)." Kaiser Steel, 455 U.S. at 86.

KCI makes a compelling argument that the arbitration awards simply enforce Local 682's no-strike pledge contained in section 4.04. If that were the case, then we could easily affirm the district court's decision. However, we are not convinced the arbitration awards simply enforce section 4.04. Instead, we believe the arbitration awards indirectly enforce section 3.03.

To determine whether section 3.03 is implicated by the arbitration awards enforcing section 4.04, we evaluate the impact of seemingly contradictory decisions by the Supreme Court in Kelly v. Kosuga, 358 U.S. 516, 516-21 (1959), and Kaiser Steel, 455 U.S. at 74-86. In Kosuga, 358 U.S. at 516-18, two parties contracted for the sale of a large amount of onions in order to fix the amount of onions sold in Illinois by agreeing not to deliver the onions on the futures market. By entering into this agreement, the parties intended improperly to inflate the price of onions. Id. at 517. When the buyer of the onions failed to make payments to the seller, the seller sued the buyer for failing to complete payment of the purchase of the onions. Id. at 516. The buyer asserted a defense that the contract for the sale of onions violated the Sherman Antitrust Act (Sherman Act), 15 U.S.C. § 1. Id. The district court rejected the defense, granted summary judgment for the seller for the unpaid price of the onions, and the Seventh Circuit affirmed. Id. at 518. The Supreme Court affirmed, stating that, "while the nondelivery agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed, it can hardly be said to enforce a violation of the Act to give legal effect to a completed sale of onions at a fair price." Id. at 521. Thus, the Court held that "where, as here, a lawful sale of a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the

sort here in question." Id. The Court's logic could apply in this case, because section 4.04 is admittedly a valid and enforceable agreement. If section 3.03 were not implicated, we would expend little effort confirming the arbitration awards.

Notwithstanding the rationale behind the Court's holding in Kosuga, the Supreme Court seemingly charted a different course for section 8(e) cases. In Kaiser Steel, 455 U.S. at 74-75, Kaiser Steel Corporation (Kaiser) entered into a collective bargaining agreement with the United Mine Workers of America (UMW) requiring Kaiser to contribute to employee health and retirement funds for each ton of coal it produced. The agreement also contained a purchased-coal clause requiring Kaiser to contribute to the funds based on the amount of coal Kaiser purchased from other producers. Id. When Kaiser refused to contribute to the funds based on the coal it purchased from other firms, the trustees of the funds sued Kaiser seeking to enforce the purchased-coal clause of the collective bargaining agreement. Id. at 76. Kaiser admitted it failed to contribute to the funds, but asserted the defense that the collective bargaining agreement was unenforceable because it violated the Sherman Act, 15 U.S.C. §§ 1-2, and section 8(e) of the NLRA. Id. When the case reached the Supreme Court, the Court stated the issue was "whether a coal producer, when it is sued on its promise to contribute to union welfare funds based on its purchases of coal from producers not under contract with the union, is entitled to plead and have adjudicated a defense that the promise is illegal under the antitrust and labor laws." Id. at 74.

Kaiser argued a court order forcing it to contribute to the funds based on the purchased-coal clause would enforce an agreement that violates both the Sherman Act and the NLRA. The trustees argued that enforcing Kaiser's agreement to contribute to the funds would not command unlawful conduct. That is, "[t]he argument is that employers' contributions to union welfare funds are not, in themselves and standing alone, illegal acts and that ordering Kaiser to pay would therefore not demand conduct that is inherently contrary to public policy." Id. at 79.

The Court rejected this argument, noting that Kaiser "did not make a naked promise to pay money to the union funds." Id. Instead, according to the Court, "[t]he purchased-coal provision obligated [Kaiser] to pay only if it purchased coal from other employers and then only if contributions to the [] funds had not been made with respect to that coal." Id. The Court reasoned that enforcing the agreement would enforce an unlawful hot cargo agreement "because of the financial burden which the agreement attached to purchases of coal from non-UMW producers, even though they may have contributed to other employee welfare funds. It is plain enough that to order Kaiser to pay would command conduct that assertedly renders the promise an illegal undertaking under the federal [antitrust and labor] statutes." Id.

The Court then distinguished Kosuga by noting that case involved "two promises, one to pay for purchased onions and the other to withhold onions from the market. The former was legal and could be enforced, the latter illegal and unenforceable." Id. at 82. As for the Kaiser Steel facts, the Court stated that, "[i]f the purchased-coal agreement is illegal, it is precisely because the promised contributions are linked to purchased coal and are a penalty for dealing with producers not under contract with the UMW." Id. The Court decided that making contributions to union welfare funds is oftentimes legal, "but an agreement linking contributions to purchased coal, if illegal, is subject to the defense of illegality." Id.

The Court then addressed whether a court had jurisdiction to adjudicate the legality of the purchased-coal agreement under section 8(e), or whether the National Labor Relations Board (Board) had exclusive jurisdiction to make an unfair labor practice determination. Id. at 83. Acknowledging the special expertise of the Board generally precludes federal jurisdiction over unfair labor practice cases, the Court noted federal courts are required to determine whether contracts violate federal law. Id. Declaring that a federal court must reach the merits of an illegality defense before enforcing a disputed contract clause, the Court held that "where a § 8(e) defense is raised by a party which § 8(e) was designed to protect, and where the defense is not

directed to a collateral matter but to the portion of the contract for which enforcement is sought, a court must entertain the defense. While only the Board may provide affirmative remedies for unfair labor practices, a court may not enforce a contract provision which violates § 8(e)." Id. at 86.

Based on our reading of Kaiser Steel, we conclude we cannot confirm the arbitration awards enforcing section 4.04, if section 3.03 is an unlawful hot cargo agreement. KCI's president candidly admitted section 4.04's no-strike pledge was gained by agreeing to section 3.03's mandate that the Project be completely union. The reason Local 682 could not strike MSC, who was a non-signatory to the Project Agreement, was because of section 3.03's requirement that KCI use only Local 682 members for the delivery of concrete to the Project site. Thus, MSC was required to use Local 682 members to do business with KCI on the Project. Although not addressing a hot cargo defense, the arbitrator even concluded that section 4.04 was enforced because that clause "stemm[ed] directly from the same negotiations which produced" section 3.03. Given Kaiser Steel's lessons, we cannot blindly confirm the arbitration awards by pretending they do not enforce section 3.03. Instead, we must determine whether section 3.03 is an unlawful hot cargo agreement. Unfortunately, we are unable to make such a determination on this record.

Section 8(e) of the NLRA makes hot cargo agreements unlawful, but exceptions exist such that clauses which may appear to be hot cargo agreements are lawful. The two exceptions that may apply in this case to section 3.03 are (1) the subcontractor industry proviso, and (2) the work preservation theory. Section 8(e)'s construction industry proviso states that the prohibition against hot cargo agreements does not "apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work." 29 U.S.C. § 158(e); see, e.g., Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645 (1982); Connell Constr. Co. v. Plumbers & Steamfitters Local

-11-

No. 100, 421 U.S. 616 (1975); Gen. Truck Drivers Local No. 957 v. NLRB, 934 F.2d 732, 737-39 (6th Cir. 1991) (holding delivery work did not fit within construction industry proviso); NLRB v. Int'l Bhd. of Teamsters Local No. 294, 342 F.2d 18, 21-22 (2d Cir. 1965) (same). If a developed record reveals section 3.03 fits within the construction industry proviso, then the arbitration awards can be enforced. If a developed record reveals section 3.03 does not fit within the construction industry proviso, then one more exception must be addressed.

In addition to section 8(e)'s construction industry proviso excepting certain agreements from the hot cargo prohibition, agreements which merely serve to preserve work for bargaining unit members are excepted from section 8(e)'s prohibition of hot cargo agreements. See, e.g., NLRB v. Int'l Longshoremen's Ass'n, 473 U.S. 61 (1985); Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 644-45 (1967) (asking "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [bargaining unit] employees," and noting the work preservation test "will not always be a simple test to apply"); Am. Boiler Mfrs. Ass'n v. NLRB, 404 F.2d 547 (8th Cir. 1968). Thus, if a developed record reveals section 3.03 is a work preservation clause, then it is not an unlawful hot cargo agreement. However, if section 3.03 is not a valid work preservation clause and does not fit within the subcontractor industry proviso, then it is an unlawful hot cargo agreement. If that is the case, then the arbitration awards cannot be enforced.

As indicated above, we cannot determine from the record whether section 3.03 fits within the construction industry proviso or is a valid work preservation clause. Instead, additional fact-finding is required to resolve this dispute. We understand KCI's frustration that the record does not contain the appropriate evidence to make this determination because Local 682 never asserted the hot cargo defense before the arbitrator. Local 682 could have raised the hot cargo defense before the arbitrator, filed an unfair labor practice charge with the Board earlier, or filed a pre-arbitration suit to enjoin arbitrating the grievance. Although Local 682 failed to raise the hot

cargo defense until well after the underlying grievance had been arbitrated, a court cannot enforce an unlawful hot cargo agreement. However, Local 682 has filed an unfair labor practice charge with the Board based on KCI's suit to enforce the arbitration awards.

Given the procedural posture of this case, we conclude the district court has two options on how to proceed. The district court can stay these proceedings to await the Board's decision on the unfair labor practice charge. See, e.g., Nelson v. Int'l Bhd. of Elec. Workers, Local No. 46, 899 F.2d 1557, 1564 (9th Cir. 1990) (holding the district "court has the discretion to review the arbitrator's award or to stay enforcement of the award pending the [Board]'s decision on the unfair labor practice claims"); David A. Anderson, Hot Cargo Enforcement after Kaiser Steel: A New Look at Section 8(e), 1983 Utah L. Rev. 493, 521 (1983) ("Potential conflict between concurrent Board and judicial proceedings could be avoided, and the goal of judicial economy promoted, if courts stayed judicial proceedings until the Board reaches a decision on the unfair labor practice charges."). Alternatively, the district court can follow Kaiser Steel's mandate to address the legality of section 3.03 itself by conducting appropriate fact-finding to determine whether either of the two exceptions apply to section 8(e)'s prohibition of hot cargo agreements.

## III.    CONCLUSION

Because we conclude the arbitration awards enforce section 3.03, and because we cannot determine on the record before us whether section 3.03 is an unlawful hot cargo agreement, we reverse the district court's entry of summary judgment in KCI's favor, vacate the order confirming the arbitration awards, and remand to the district court for further proceedings consistent with this opinion.

_____